FIBER–LITE CORPORATION, Plaintiff,

v.

MOLDED ACOUSTICAL PRODUCTS
OF EASTON, INC., Defendant.

Civ. A. No. 93–4056.

United States District Court,
E.D. Pennsylvania.

July 26, 1994.

Paul D. Keenan, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, Paul E. Becher, Jacqueline S. Homann, Barnes and Thornburg, Elkhart, IN, for plaintiff.

Paul J. Winterhalter, David S. Fishbone, Ciardi, Fishbone & Di Donato, Philadelphia, PA, Timothy J. Abeska, Roemer and Mintz, South Bend, IN, David L. Simmons, Lowe, Gray, Steele and Hoffman, Indianapolis, IN, for defendant.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

Plaintiff, Fiber–Lite Corporation ("Fiber–Lite"), brought this action against defendant Molded Acoustical Products of Easton, Inc. ("Easton") seeking payment for past debts incurred by Molded Acoustical Products of Indiana, Inc. ("Indiana") totalling $555,-792.00. Fiber–Lite alleges that Easton is merely the continuation of Indiana and therefore is liable for the debts and obligations of Indiana as Indiana's successor. Prior to the commencement of trial, the parties informed the Court that they had stipulated to all the relevant facts and agreed to let the Court decide the matter based on the parties' sub-missions of the relevant evidence. Easton did make an offer of proof, containing an additional 27 facts which Fiber–Lite objected to on the ground of relevance. Since we will find in Easton's favor based on the stipulated record before us, we need not address Fiber–Lite's objection.

### I. *Factual Background*

The parties have stipulated to the following facts:

1. Fiber–Lite is an Ohio corporation with its principal place of business in Lucas County, Ohio. Fiber–Lite is a manufacturer and supplier of fiberglass products.

2. Easton, has a principal place of business located at Three Danforth Drive in Easton, Pennsylvania, and maintains a separate business establishment at 29269 Lexington Park Drive in Elkhart, Indiana.

3. On May 26, 1989, Indiana filed a voluntary Chapter 11 bankruptcy petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under Case No. 89–20869 (TMT).

4. On the same day, separate Chapter 11 Bankruptcy proceedings were instituted by Molded Acoustical Products, Inc. under Case No. 89–20868 (TMT); Molded Acoustical Products of West Virginia, Inc., under Case No. 89–20867 (TMT) and MAP International, Inc., under Case No. 89–20866(TMT); all proceedings having been filed with the United States Bankruptcy Court for the Eastern District of Pennsylvania. The aforesaid companies having filed bankruptcy proceedings shall hereinafter collectively be referred to as the "Debtors".

5. On May 26, 1989, Indiana was indebted to Fiber–Lite in the amount of $351,180.00 for the prior sale and delivery of fiberglass products.

6. On May 26, 1989, the Debtors, including Indiana, were collectively indebted to Merchants Bank, N.A., under a secured financing arrangement which indebtedness totalled $7,800,000.00 and was secured by the Debtors, including Indiana, having granted to the bank a security interest in all present and future accounts, contract rights, invento-

ry, machinery, equipment, general intangibles, instruments, documents, chattel paper and all proceeds and products of and replacements to the foregoing.

7. In June of 1989, the Debtors, including Indiana, entered into a certain post-bankruptcy financing agreement ("Cash Collateral Agreement") with their secured creditor, Merchants Bank, N.A., (the "Bank") which agreement acknowledged the existing secured debt due to the Bank, confirmed the collateral of the Debtors, including Indiana, which secured the repayment of the debt to the Bank, and provided for continued use of the collateral by the various Debtors during the pendency of the separate Bankruptcy proceedings under specific terms and conditions.

8. The Cash Collateral Agreement specifically granted the continuation and/or replacement of all liens on collateral of the Debtors, including Indiana, and the right to proceed with enforcement of its private remedies without further need to seek relief from the automatic stay provisions of 11 U.S.C. § 362 upon an event of default. (Cash Collateral Agreement, pages 10–11, paragraph 6, 7, and 8).

9. Following the filing of a Motion in the Bankruptcy Court, and Notice being provided to required creditors and other parties in interest, including representatives of Fiber–Lite, the Bankruptcy Court by Order of the Honorable Thomas M. Twardowski, Chief Judge, dated July 13, 1989, approved the post-petition financing agreement.

10. During the pendency of the Indiana Bankruptcy proceeding, the Debtors instituted a preference action pursuant to 11 U.S.C. § 547 of the United States Code, seeking to avoid $204,612.00 in payments made by Indiana to Fiber–Lite during the ninety (90) days preceding the Bankruptcy filing.

11. Following a trial, a verdict was entered in favor of Indiana and against Fiber–Lite for the full amount of the preference claim. On appeal, the District court affirmed the decision of the Bankruptcy Court. On a subsequent appeal, the United States Court of Appeals for the Third Circuit affirmed the lower court's rulings.

12. The effect of the decision by the Third Circuit increased the indebtedness due to Fiber–Lite from Indiana to $555,792.00.

13. On March 13, 1991, the Bank declared the Debtors, including Indiana, in default under the Cash Collateral Agreement.

14. On December 18, 1991, the Bank issued a letter which confirmed the Bank's action of constructively foreclosing upon the assets of the Debtors, including Indiana, and causing a sale of certain of the assets pursuant to 13 Pa.Cons.Stat.Ann. § 9504 to Easton.

15. On December 23, 1991, a closing was conducted at which Easton acquired certain assets from the Bank. In conjunction with the closing, the parties executed substantial documentation confirming and supporting the commercial transaction including the following:

1) Assumption and Loan Reaffirmation Agreement dated December 23, 1991 (Exhibit 6);
2) Promissory Note dated December 23, 1991 (Exhibit 7);
3) Security Agreement dated December 23, 1991 (Exhibit 8);
4) Bill of Sale dated December 23, 1991 between the bank and Easton (Exhibit 9);
5) Lease Agreements dated December 23, 1991 (Exhibits 10 and 11).

16. At all relevant times, the sole Shareholder of Indiana was John A. D'Amico, Sr.

17. At all relevant times, the Shareholders of Easton were John A. D'Amico, Jr. and Michele Dultz, the children of John A. D'Amico, Sr.

18. The directors of Indiana are:
John A. D'Amico, Sr.
Michelina D'Amico

19. The directors of Easton are:
John A. D'Amico, Sr.
John A. D'Amico, Jr.
David S. Fishbone (1991–1992)
Michelina D'Amico (1992–——)

20. The officers of Indiana are:
John A. D'Amico, Sr., President

Michelina D'Amico, Assistant Secretary/Treasurer

21. The officers of Easton are:

John A. D'Amico, Sr., President

Katherine Montlebono, Secretary (1991–1992)

Michelina D'Amico, Treasurer

Michele Dultz (1992–——)

22. John D'Amico, Sr. had intended to be the shareholder of the corporation purchasing the collateral from the Bank. At the time of the sale of the collateral, however, he was instructed by the Bank that the shareholders of the purchasing corporation must be his son and daughter, John D'Amico, Jr. and Michele Dultz.

23. John A. D'Amico, Jr. did not know he was to be a shareholder of Easton until a few days before the December 23, 1991 loan closing with the bank.

24. Easton produced and sold the same or similar product that had been produced and sold by Indiana.

25. Subsequent to December 23, 1991, Easton hired all individuals who had previously been employed by Indiana.

26. On December 23, 1991, Easton opened new bank accounts and maintained separate and distinct financial records from any of the Debtors, including Indiana.

27. Easton maintains its own Employer Identification Number.

28. Easton files separate tax returns for its business.

Fiber–Lite argues that Easton is merely a continuation of Indiana and therefore liable as a successor corporation for Indiana's indebtedness to Fiber–Lite. Specifically, Easton points to the fact that once Easton purchased the assets of Indiana, Easton continued the operations of Indiana, continued to produce and sell the same product as Indiana, employed the same individuals as had been employed by Indiana, maintained the same president and chief executive officer as Indiana and maintained other officers

and directors of Indiana. Easton responds that it cannot be responsible for the unsecured obligations of Indiana since it acquired Indiana's assets from a foreclosure sale conducted by a secured creditor pursuant to 13 Pa.Cons.Stat.Ann. § 9504. Easton contends that under § 9504(d), the disposal of Indiana's collateral by the Bank discharged not only the security interest under which it was made but also any lien or claim subordinate thereto, including the claims of any pre-existing unsecured creditor of the defaulting debtor.

## II. *Discussion*

■ Under Pennsylvania law [1], the general rule of successor liability is that where one company sells or transfers all of its assets to another, the latter is not responsible for the debts and liabilities of the transferor. *Polius v. Clark Equipment Company,* 802 F.2d 75, 77 (3d Cir.1986); *Gehin–Scott v. Newson, Inc.,* 1994 WL 2530, 1994 U.S.Dist. Lexis 11 (E.D.Pa.); *Simmers v. American Cyanamid Corp.,* 394 Pa.Super. 464, 482, 576 A.2d 376, 386 (1990); *Dawejko v. Jorgenson Steel Co.,* 290 Pa.Super. 15, 18, 434 A.2d 106, 107 (1981).

■ However, Pennsylvania, as does most other jurisdictions, recognizes the following four exceptions to the general rule:

1. The purchaser expressly or impliedly agrees to assume the obligation;

2. The transaction amounts to a consolidation or merger;

3. The purchasing corporation is merely a continuation of the selling corporation;

4. The transaction was fraudulently entered into to escape liability.

*Polius,* 802 F.2d at 78; *Philadelphia Electric Company v. Hercules,* 762 F.2d 303, 308–309 (3d Cir.1985); *Stutzman v. Syncro Machine Co.,* 1991 WL 66796, 1991 U.S.Dist.Lexis 5308 (E.D.Pa.1991); *Gehin–Scott v. Newson, Inc.,* 1994 WL 2530, *2, 1994 U.S.Dist.Lexis 11, *6 (E.D.Pa.); *Ross Controls, Inc. v. United States,* 160 B.R. 527, 532 (E.D.Pa.1993);

---

**1.** The question of whether the standard for successor liability has been met is governed by state law.

*Commonwealth v. Lavelle,* 382 Pa.Super. 356, 374, 555 A.2d 218, 226 (1989).

▮ In the case *sub judice,* Fiber–Lite contends that Easton is a mere continuation of its predecessor, Indiana, and is therefore liable for Indiana's debts to Fiber–Lite. The mere continuity exception is actually subsumed by the de facto merger exception. *Atlas Tool Co., Inc. v. C.I.R.,* 614 F.2d 860, 871 (3d Cir.1980); *Ross Controls, supra.* In essence, the purchasing corporation merely continues or de facto merges with the selling corporation. A de facto merger requires:

1. A continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets and general business operations;

2. A continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation;

3. The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible;

4. The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Philadelphia Electric Company,* 762 F.2d at 310; *Gehin–Scott,* 1994 WL 2530 at *3, 1994 U.S.Dist. 11 Lexis at *8.

Of the four elements necessary for a de facto merger to occur, this Court has found that the second factor, the transfer of stock, is a key element because it represents a continuity of ownership. *Gehin–Scott,* 1994 WL 2530 at *3, 1994 U.S.Dist.Lexis 11 at *9; *Stutzman,* 1991 WL 66796 at 4, 1991 U.S.Dist.Lexis 5308 at *15; *Savini v. Kent Machine Works, Inc.,* 525 F.Supp. 711, 717 (E.D.Pa.1981); An "essential inquiry in the de facto merger context is whether the shareholders of the predecessor corporation become shareholders of the successor through the successor's use of stock in pay-

ment for the predecessor's assets." *Tracey v. Winchester Repeating Arms Co.,* 745 F.Supp. 1099, 1110, n. 18 (E.D.Pa.1990).

▮ In the case *sub judice,* three of the four requirements are satisfied. With regard to the first requirement, John A. D'Amico, Sr. and Michelina D'Amico were the directors of Indiana and are two of the four directors of Easton. John A. D'Amico, Sr. and Michelina D'Amico were the officers of Indiana and are two of the four officers of Easton. Easton hired all individuals who had previously been employed by Indiana. (Easton does have a different physical location from Indiana, maintains a separate bank account and financial records from Indiana, maintains its own Employer Identification Number, and files separate tax returns.)

With regard to the third factor, it is undisputed that the seller corporation, Indiana, has been dissolved. Finally, with regard to the fourth factor, the parties have stipulated that Easton produces and sells the same or similar product that has been produced and sold by Indiana.

With regard to the important second element, the record reveals that Easton did not pay for Indiana's assets with *shares of stock* to *Indiana,* but rather purchased Indiana's assets *from the Bank* at the foreclosure sale with the proceeds from the Bank's loan as evidenced by the promissory note executed by Easton on December 23, 1991. This Court in *Gehin–Scott* specifically recognized that where the purchasing corporation pays for the stock with independent consideration such as cash, a de facto merger cannot exist. *Gehin–Scott,* 1994 WL 2530 at *3–4, 1994 U.S.Dist. Lexis 11 at *10.

Moreover, the parties have stipulated that the shareholders of Easton are the children of John D'Amico, Sr. whereas John D'Amico, Sr. was the sole shareholder of Indiana. Fiber–Lite has not offered any proof that the children have no involvement with Easton.

In conjunction with the second element, the crucial distinction between the case *sub judice* and the ordinary successor liability case is that the transaction here arose out of a foreclosure sale conducted in accordance with the Uniform Commercial Code as

adopted by the Commonwealth of Pennsylvania.

The Bank had a perfected secured lien in the assets of the Debtors, including Indiana. This lien was further confirmed when the Cash Collateral Agreement was executed and approved by the Bankruptcy Court upon notice to all interested parties, including Fiber–Lite. This financing agreement confirmed the collateral of the Debtors, including Indiana, acknowledged the existing secured debt due to the Bank, and permitted the continued use of the collateral by Indiana and the other Debtors. However, less than two years later, Indiana defaulted under the Cash Collateral Agreement. Accordingly, the Bank, as permitted by the Cash Collateral Agreement, foreclosed on the collateral.

Disposition of this collateral is controlled by 13 Pa.Conn.Stat.Ann. § 9504. The "[s]ale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." 13 Pa.Conn.Stat.Ann. § 9504(c). The statute further provides that "[w]hen collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the rights of the debtor therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interest even though the secured party fails to comply with the requirements of this chapter or of any judicial proceeding ... if the purchaser acts in good faith." 13 Pa.Conn.Stat.Ann. § 9504(d)(2).

In the case *sub judice,* after the Debtors, including Indiana, defaulted under the Cash Collateral Agreement, the secured party, the Bank, transferred Indiana's assets to Easton for cash consideration, thereby discharging all subordinate security interests and liens on the assets, including Indiana's unsecured debt to Fiber–Lite. Accordingly, Easton took Indiana's assets free of the indebtedness due to Fiber–Lite from Indiana in the amount of $555,792.00. While such a transaction on the surface may raise suspicion, Fiber–Lite has offered absolutely no proof that Easton did not act in good faith or that the Bank colluded with Easton or otherwise acted in a commercially unreasonable manner. In the absence of such proof, this Court has no option but to believe that Easton was the most commercially reasonable buyer. Thus, even assuming that Easton was the successor to Indiana, because it acquired Indiana's assets pursuant to § 9504(d)(2) of the foreclosure statute, it is not liable for Indiana's indebtedness.

■ Fiber–Lite argues that the bankruptcy of Indiana and the sale of its assets in a foreclosure sale by the Bank are irrelevant in determining successor liability, citing the decision of this Court in *Ross Controls, Inc. v. United States Dept. of Treasury Internal Revenue Service,* 160 B.R. 527 (E.D.Pa.1993). In *Ross,* Milross Controls, Inc., ("Milross") was in a bankruptcy proceeding under Chapter 7 of the Bankruptcy Code while at the same time indebted to the Internal Revenue Service ("IRS") for federal taxes. During the bankruptcy proceeding, Milross' sole shareholder and officer, Milton Ross, incorporated "The Milton Ross Company" and became its sole shareholder and officer. The IRS seized and auctioned certain items that had been owned by Milross. At the auction, the Milton Ross Company purchased most of these items.

Mr. Ross subsequently incorporated Ross Controls, Inc. as an estate planning mechanism. Pursuant to an Asset–Purchase Agreement, the Milton Ross Co. sold all of its assets and liabilities to Ross Controls. Ross Controls conducted the same business as the Milton Ross Company, hired the same employees and had the same customers and supplies as the Milton Ross Company. The sole shareholder of Ross Controls was Mr. Ross' daughter. However, the daughter was not involved in running the business and received no remuneration from the company. Instead, Mr. Ross maintained control of Ross Controls.

Judge Brody found that despite the fact that Milross was in bankruptcy under Chapter 7 and that its assets were sold by a third party, the IRS, both the Milton Ross Company and Ross Controls were successor corporations to Milross and liable for its tax debt.

Judge Brody based her decision on the fact that Ross Controls was in the same business with the same employees, customers and suppliers as Milross and was controlled by the same individuals who controlled Milross.

Fiber–Lite contends that Easton should be liable for Indiana's indebtedness since Indiana was in bankruptcy, its assets were sold by a third-party, the Bank, to Easton, and Easton does the same business as Indiana, is essentially controlled by the same directors and officers as Indiana and employs the same individuals.

However, there is a major distinction between *Ross Controls* and the case *sub judice*. All Ross Controls held was that filing for Chapter 7 does not prevent the filing corporation from having a successor corporation. The case *sub judice*, on the other hand, involves much more than the mere filing of a bankruptcy petition. It involves the sale of the bankrupt entity's assets through the state foreclosure statute which specifically states that if the purchaser (Easton) acts in good faith and the sale of the assets is commercially reasonable, the purchaser takes the assets free of any subordinate security interests or liens. Therefore, Easton, unlike Ross Controls, acquired the assets of Indiana free of Indiana's indebtedness, notwithstanding any possibility that Easton may be the successor to Indiana.

█ We realize that Fiber–Lite will view our conclusion as harsh and we also admit that we are somewhat troubled by the result in this case. However, in the absence of proof that the sale of Indiana's assets from the Bank to Easton was not commercially reasonable or that Easton did not act in good faith as the purchaser of those assets, we have no choice but to follow the plain language of § 9504(d)(2) of the foreclosure statute. We will, however, reconsider our decision if Fiber–Lite or any other entity can submit any evidence indicating that the transaction between the Bank and Easton was not commercially reasonable or that Easton did not act in good faith.

## CONCLUSION

For the reasons set forth above, we shall enter judgment in favor of Easton and against Fiber–Lite.

## *ORDER*

Judgment is entered in favor of the defendant Molded Acoustical Products of Easton, Inc. and against the plaintiff Fiber–Lite Corporation.

The court will reconsider its decision if Fiber–Lite Corporation or any other entity can demonstrate to the Court that the sale of Indiana's assets by the Bank to Easton was not commercially reasonable or that Easton did not act in good faith as the purchaser of those assets.

IT IS SO ORDERED.