**FIBER–LITE CORPORATION, Plaintiff,**

**v.**

**MOLDED ACOUSTICAL PRODUCTS OF EASTON, INC., Defendant.**

**Civ.A. No. 93–4056.**

United States District Court, E.D. Pennsylvania.

Sept. 29, 1994.

Paul D. Keenan, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, Paul E. Becher, Jacqueline S. Homann, Barnes and Thornburg, Elkhart, IN, for plaintiff.

Paul J. Winterhalter, David S. Fishbone, Ciardi, Fishbone & Di Donato, Philadelphia, PA, Timothy J. Abeska, Roemer and Mintz, South Bend, IN, David L. Simmons, Lowe, Gray, Steele and Hoffman, Indianapolis, IN, for defendant.

### MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

Plaintiff, Fiber–Lite Corporation ("Fiber–Lite"), brought this action against defendant Molded Acoustical Products of Easton, Inc. ("Easton") seeking payment for past debts incurred to Fiber–Lite by Molded Acoustical Products of Indiana, Inc. ("Indiana") totalling $555,792.00. Fiber–Lite contends that Easton is merely the continuation of Indiana and therefore is liable for the debts and obligations of Indiana as Indiana's successor. Prior to the commencement of trial, the parties informed the Court that they had stipulated to all the relevant facts and agreed to allow the Court decide the matter based on the parties' submissions of the relevant evidence. Easton did make an offer of proof, containing an additional 27 facts which Fiber–Lite objected to on the ground of relevance. In a Memorandum Opinion and Order dated July 26, 1994, 170 B.R. 847, we entered judgment in favor of Easton and

against Fiber–Lite.[1] Presently before the Court is the motion of Fiber–Lite for reconsideration of our Memorandum Opinion and Order of July 26, 1994, 170 B.R. 847. On September 12, 1994, the Court heard oral argument on the motion. For the reasons which follow, the motion is granted.

In order to properly reconsider our decision, it is necessary to reiterate the facts to which the parties have stipulated which are as follows:

1. Fiber–Lite is an Ohio corporation with its principal place of business in Lucas County, Ohio. Fiber–Lite is a manufacturer and supplier of fiberglass products.

2. Easton has a principal place of business located at Three Danforth Drive in Easton, Pennsylvania, and maintains a separate business establishment at 29269 Lexington Park Drive in Elkhart, Indiana.

3. On May 26, 1989, Indiana filed a voluntary Chapter 11 bankruptcy petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under Case No. 89–20869 (TMT).

4. On the same day, separate Chapter 11 Bankruptcy proceedings were instituted by Molded Acoustical Products, Inc. under Case No. 89–20868 (TMT); Molded Acoustical Products of West Virginia, Inc., under Case No. 89–20867 (TMT) and MAP International, Inc., under Case No. 89–20866 (TMT); all proceedings having been filed with the United States Bankruptcy Court for the Eastern District of Pennsylvania. The aforesaid companies having filed bankruptcy proceedings shall hereinafter collectively be referred to as the "Debtors".

5. On May 26, 1989, Indiana was indebted to Fiber–Lite in the amount of $351,180.00 for the prior sale and delivery of fiberglass products.

6. On May 26, 1989, the Debtors, including Indiana, were collectively indebted to Merchants Bank, N.A. ("the Bank"), under a secured financing arrangement which indebtedness totalled $7,800,000.00 and was secured by the Debtors, including Indiana, having granting to the Bank a security interest in all present and future accounts, contract rights, inventory, machinery, equipment, general intangibles, instruments, documents, chattel paper and all proceeds and products of and replacements to the foregoing.

7. In June of 1989, the Debtors, including Indiana, entered into a certain post-bankruptcy financing agreement ("Cash Collateral Agreement") with their secured creditor, the Bank, which agreement acknowledged the existing secured debt due to the Bank, confirmed the collateral of the Debtors, including Indiana, which secured the repayment of the debt to the Bank, and provided for continued use of the collateral by the various Debtors during the pendency of the separate Bankruptcy proceedings under specific terms and conditions.

8. The Cash Collateral Agreement specifically granted the continuation and/or replacement of all liens on collateral of the Debtors, including Indiana, and the right to proceed with enforcement of its private remedies without further need to seek relief from the automatic stay provisions of 11 U.S.C. § 362 upon an event of default. (Cash Collateral Agreement, pages 10–11, paragraph 6, 7, and 8).

9. Following the filing of a Motion in the Bankruptcy Court, and Notice being provided to required creditors and other parties in interest, including representatives of Fiber–Lite, the Bankruptcy Court by Order of the Honorable Thomas M. Twardowski, Chief Judge, dated July 13, 1989, approved the post-petition financing agreement.

10. During the pendency of the Indiana Bankruptcy proceeding, the Debtor instituted a preference action pursuant to 11 U.S.C. § 547 of the United States Code, seeking to avoid $204,612.00 in payments made by Indiana to Fiber–Lite during the ninety (90) days preceding the Bankruptcy filing.

11. Following a trial, a verdict was entered in favor of Indiana and against Fiber–Lite for the full amount of the preference claim. On appeal, the District court affirmed

1. Since we found in Easton's favor based on the stipulated record before us, we did not address Fiber–Lites's objection.

the decision of the Bankruptcy Court. On a subsequent appeal, the United States Court of Appeals for the Third Circuit affirmed the lower court's rulings.

12. The effect of the decision by the Court of Appeals increased the indebtedness due to Fiber–Lite from Indiana to $555,792.00.

13. On March 13, 1991, the Bank declared the Debtors, including Indiana, in default under the Cash Collateral Agreement.

14. On December 18, 1991, the Bank issued a letter which confirmed the Bank's action of constructively foreclosing upon the assets of the Debtors, including Indiana, and causing a sale of certain of the assets pursuant to 13 Pa.Cons.Stat.Ann. § 9504 to Easton.

15. On December 23, 1991, a closing was conducted at which Easton acquired certain assets from the Bank. In conjunction with the closing, the parties executed substantial documentation confirming and supporting the commercial transaction including the following:

1) Assumption and Loan Reaffirmation Agreement dated December 23, 1991 (Exhibit 6);

2) Promissory Note dated December 23, 1991 (Exhibit 7);

3) Security Agreement dated December 23, 1991 (Exhibit 8);

4) Bill of Sale dated December 23, 1991 between the bank and Easton (Exhibit 9);

5) Lease Agreements dated December 23, 1991 (Exhibits 10 and 11).

16. At all relevant times, the sole Shareholder of Indiana was John A. D'Amico, Sr.

17. At all relevant times, the Shareholders of Easton were John A. D'Amico, Jr. and Michele Dultz, the children of John A. D'Amico, Sr.

18. The directors of Indiana are:
John A. D'Amico, Sr.
Michelina D'Amico

19. The directors of Easton are:
John A. D'Amico, Sr.
John A. D'Amico, Jr.

David S. Fishbone (1991–1992)
Michelina D'Amico (1992–      )

20. The officers of Indiana are:
John A. D'Amico, Sr., President
Michelina D'Amico, Assistant Secretary/Treasurer

21. The officers of Easton are:
John A. D'Amico, Sr., President
Katherine Montlebono, Secretary (1991–1992)
Michelina D'Amico, Treasurer
Michele Dultz (1992–      )

22. John D'Amico, Sr. had intended to be the shareholder of the corporation purchasing the collateral from the Bank. At the time of the sale of the collateral, however, he was instructed by the Bank that the shareholders of the purchasing corporation must be his son and daughter, John D'Amico, Jr. and Michele Dultz.

23. John A. D'Amico, Jr. did not know he was to be a shareholder of Easton until a few days before the December 23, 1991 loan closing with the bank.

24. Easton produced and sold the same or similar product that had been produced and sold by Indiana.

25. Subsequent to December 23, 1991, Easton hired all individuals who had previously been employed by Indiana.

26. On December 23, 1991, Easton opened new bank accounts and maintained separate and distinct financial records from any of the Debtors including Indiana.

27. Easton maintains its own Employer Identification Number.

28. Easton files separate tax returns for its business.

In its motion for reconsideration, Fiber–Lite urges the Court to go beyond the stipulated facts and make additional factual findings based on the submitted deposition testimony of John D'Amico, Sr., the shareholder and chief executive officer of Indiana and the chief executive officer of Easton and the deposition testimony of George Miller, the accountant for Easton and now for Indiana. Based on this deposition testimony, the

Court makes the following undisputed findings:

1. John D'Amico, Sr. testified that the consideration paid by Easton to acquire the assets that had previously been Indiana's consisted of an assumption of liabilities and not cash. Deposition of John D'Amico, Sr., Plaintiff's Trial Exhibit D, p. 40.

2. John D'Amico, Sr. testified that the Bank made it a condition of its sale of the assets that he not own any stock in Easton. He further testified that he does not know why the Bank imposed that condition, stating "I can't say that I really know what the hell happened in that whole transaction and why they did it or why it was done the way it was done. I accepted it because it was the only game on the block."

*Id.* at pp. 30–33.

3. In response to a question as to how he came up with the name MAP Easton, Molded Acoustical Products of Easton, Inc., John D'Amico, Sr. testified that "We decided to keep the continuity with the image of Molded Acoustical Products in the marketplace as best we could and not to make any major waves or get involved with reestablishing our company with a new totally different name."

"Mr. Fishbone [D'Amico's lawyer] said how about naming it Molded Acoustical Products of Easton, Inc. We said that is kind of long, and eventually we said we can make it MAP of Easton, Inc. That sort of kept the continuity of the company intact. That's how that came about."

*Id.,* at pp. 37–38.

4. John D'Amico, Sr. testified that during the first four to six months following the closing Easton used the same facility to produce the same product which had been produced by Indiana. *Id.,* at p. 39.

5. George Miller testified, "Here, again, the plan of reorganization, in my professional opinion, would have been the way to go, but the bank, for whatever reason, did not want to have a loan in its portfolio with old companies' names on it. They wanted a new company with new stockholders."

Deposition of George Miller, Plaintiff's Trial Exhibit F, p. 42

5. George Miller also testified, "I have been working in bankruptcies for 15 years and I have never seen a bank so entrenched and single minded on what they are trying to accomplish."

*Id.,* at 34.[2]

In its trial brief, Fiber–Lite argued that Easton is merely a continuation of Indiana and therefore liable as a successor corporation for Indiana's indebtedness to Fiber–Lite. Specifically, Fiber–Lite pointed to the fact that once Easton purchased the assets of Indiana from the Bank, Easton continued the operations of Indiana in the same facility, continued to produce and sell the same product as Indiana, employed the same individuals as had been employed by Indiana, maintained the same president and chief executive officer as Indiana and maintained other officers and directors of Indiana.

Easton responded in its trial brief that it cannot be responsible for the unsecured obligations of Indiana since it acquired Indiana's assets in a foreclosure sale conducted by a secured creditor pursuant to 13 Pa.Cons.Stat. Ann. § 9504. Easton contends that under § 9504(d), the disposal of Indiana's collateral by the Bank discharged not only the security interest under which it was made but also any lien or claim subordinate thereto, including the claims of any pre-existing unsecured creditor of the defaulting debtor, Indiana.

In our Memorandum Opinion of July 26, 1994, 170 B.R. 847, we first recognized that under Pennsylvania law[3], the general rule of successor liability is that where one company

---

**2.** As noted above, Easton submitted on the record an offer of proof containing 27 additional facts which Fiber–Lite objected to on the ground of relevance. After reviewing the proposed facts, we find that none of them relevant to our consideration of the issues in this case and therefore we sustain Fiber–Lite's objection. Indeed, some of the proposed facts are not facts at all, but are legal conclusions. See, e.g., # 25 (The Bank engaged in commercially reasonable efforts to liquidate the collateral); # 26 (No collusion existed between the Bank and Easton); # 27 (Easton, at all times, acted in good faith).

**3.** The question of whether the standard for successor liability has been met is governed by state law.

sells or transfers all of its assets to another, the latter is not responsible for the debts and liabilities of the transferor. *Polius v. Clark Equipment Company*, 802 F.2d 75, 77 (3d Cir.1986); *Gehin–Scott v. Newson, Inc.*, 1994 WL 2530, 1994 U.S.Dist. Lexis 11 (E.D.Pa. 1994); *Simmers v. American Cyanamid Corp.*, 394 Pa.Super. 464, 482, 576 A.2d 376, 386 (1990); *Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 18, 434 A.2d 106, 107 (1981).

We then noted that Pennsylvania, as does most other jurisdictions, recognizes the following four exceptions to the general rule:

1. The purchaser expressly or impliedly agrees to assume the obligation;

2. The transaction amounts to a consolidation or merger;

3. The purchasing corporation is merely a continuation of the selling corporation;

4. The transaction was fraudulently entered into to escape liability.

*Polius*, 802 F.2d at 78; *Philadelphia Electric Company v. Hercules*, 762 F.2d 303, 308–309 (3d Cir.1985); *Stutzman v. Syncro Machine Co.*, 1991 WL 66796, 1991 U.S.Dist.Lexis 5308 (E.D.Pa.1991); *Gehin–Scott v. Newson, Inc.*, 1994 WL 2530, *2, 1994 U.S.Dist.Lexis 11, *6 (E.D.Pa.1994); *Ross Controls, Inc. v. United States Department of the Treasury, Internal Revenue Service*, 160 B.R. 527, 532 (E.D.Pa.1993); *Commonwealth v. Lavelle*, 382 Pa.Super. 356, 374, 555 A.2d 218, 226 (1989);

**4.** A de facto merger requires:

1. A continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets and general business operations;
2. A continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation;
3. The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible;
4. The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

We then noted that the continuity exception which Fiber–Lite contended applied is actually subsumed by the de facto merger exception. *Atlas Tool Co., Inc. v. C.I.R.*, 614 F.2d 860, 871 (3d Cir.1980). In essence, the acquiring corporation merely continues or de facto merges with the selling corporation. We then proceeded to analyze whether the facts of this case satisfied the requirements of the de facto merger exception.[4] We found that the important second element[5] was not satisfied since the record revealed that Easton did not pay for Indiana's assets with shares of stock to Indiana, but rather purchased Indiana's assets from the Bank at the foreclosure sale with the proceeds from the Bank loan. In conjunction with the second element, we noted that the crucial distinction between the case *sub judice* and the ordinary successor liability case is that the transaction here arose out of a foreclosure sale conducted in accordance with the Uniform Commercial Code as adopted by the Commonwealth of Pennsylvania. We observed that:

> The Bank had a perfected secured lien in the assets of the Debtors, including Indiana. This lien was further confirmed when the Cash Collateral Agreement was executed and approved by the Bankruptcy Court upon notice to all interested parties, including Fiber–Lite. This financing agreement confirmed the collateral of the Debtors, including Indiana, acknowledged the existing secured debt due to the Bank, and permitted the continued use of the collateral by Indiana and the other Debtors. However, less than two years later,

*Philadelphia Electric Company*, 762 F.2d at 310; *Gehin–Scott*, 1994 WL 2530 at *3, 1994 U.S.Dist. 11 Lexis at *8.

**5.** Of the four elements necessary for a de facto merger to occur, this Court has found that the second factor, the transfer of stock, is a key element because it represents a continuity of ownership. *Gehin–Scott*, 1994 WL 2530 at *3, 1994 U.S.Dist.Lexis 11 at *9; *Stutzman*, 1991 WL 66796 at *4, 1991 U.S.Dist.Lexis 5308 at *15; *Savini v. Kent Machine Works, Inc.*, 525 F.Supp. 711, 717 (E.D.Pa.1981); An "essential inquiry in the de facto merger context is whether the shareholders of the predecessor corporation become shareholders of the successor through the successor's use of stock in payment for the predecessor's assets." *Tracey v. Winchester Repeating Arms Co.*, 745 F.Supp. 1099, 1110 (E.D.Pa.1990), n. 18.

Indiana defaulted under the Cash Collateral Agreement. Accordingly, the Bank, as permitted by the Cash Collateral Agreement, foreclosed on the collateral.

Disposition of this collateral is controlled by 13 Pa.Cons.Stat.Ann. § 9504. The "[s]ale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." 13 Pa.Cons.Stat. Ann. § 9504(c). The statute further provides that "[w]hen collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the rights of the debtor therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interest even though the secured party fails to comply with the requirements of this chapter or of any judicial proceeding ... if the purchaser acts in good faith." 13 Pa.Cons.Stat. Ann. § 9504(d)(2).

170 B.R. at 852.

We found that in the case *sub judice*, after the Debtors, including Indiana, defaulted under the Cash Collateral Agreement, the secured party, the Bank, disposed of Indiana's collateral to Easton, the purchaser, which, under the language of § 9504(d) took Indiana's assets free of all subordinate security interests and liens. Accordingly, we concluded that Easton took Indiana's assets free of the indebtedness due to Fiber–Lite from Indiana in the amount of $555,792.00. We further noted that Fiber–Lite did not offer any proof that Easton did not act in good faith or that the Bank colluded with Easton or otherwise acted in a commercially unreasonable manner. In the absence of such proof, we found that we had no choice but to believe that Easton was the most commercially reasonable buyer.

■ In its motion for reconsideration, Fiber–Lite first contends that it was claiming successor liability pursuant to the continuity and fraud exceptions to the general rule against successor liability and that the Court erred by concluding that the "mere continui-

ty exception is actually subsumed by the de facto merger exception" and by then applying the de facto merger exception to the facts of this case. Fiber–Lite points out that our Court of Appeals in *Atlas* and this Court in *Ross Controls* stated that the de facto merger exception is "interrelated" to and not "subsumed" by the continuity exception. *Atlas,* 614 F.2d at 871; *Ross Controls,* 160 B.R. at 532.

We will not bicker with Fiber–Lite over semantics other than to note that in a concurring and dissenting opinion to the majority's opinion in *Polius, supra,* Circuit Judge Mansmann specifically stated that "[t]he *de facto* merger doctrine subsumes the mere continuation theory." *Polius, supra* at 85. As Fiber–Lite requests, we will apply the continuity exception to the facts of this case. That exception, like the de facto merger exception, requires us to consider such factors as "continuity of management, personnel, location, assets, and operations." *Ross Controls, Id.,* citing *Atlas Tool Co., Id.* at 871. *See also Dawejko,* 434 A.2d at 108 (1981) (Traditionally, the continuation exception applies only when there is a common identity of officers, directors, and stock between the selling and purchasing corporations, and only one corporation after the transfer).

In the case *sub judice,* the record reveals that Easton is indeed merely the continuation of Indiana and must be responsible for the $555,792.00 unsecured debt incurred by Indiana to Fiber–Lite. Easton has essentially the same directors and officers as Indiana. Stipulation of Facts at ¶¶ 18–21. John D'Amico, Sr. was the President and one of the directors of Indiana and is the President and one of the directors of Easton. Stipulation of Facts at ¶¶ 18–21. John D'Amico, Sr. was the sole shareholder of Indiana and intended to be the sole shareholder of Easton until he was instructed by the Bank that the shareholders of Easton had to be his children. Stipulation of Facts at ¶¶ 16, 17, 22. Nevertheless, it is John D'Amico, Sr. who, as President and one of the directors, controls Easton. John D'Amico, Jr. testified that he did not know he was to be a shareholder of Easton until a few days before the December 23, 1991 loan closing with the Bank. Stipula-

tion of Facts at ¶ 23. Easton produced and sold the same or similar product that had been produced and sold by Indiana. Stipulation of Facts at ¶ 24. In the first four to six months after the closing, Easton used the same facility as Indiana. D'Amico Deposition at 39. Easton hired all individuals who had previously been employed by Indiana. Stipulation of Facts at ¶ 25. Mr. D'Amico even testified that he chose the name MAP of Easton, Inc. because that "sort of kept the continuity of the company and the image of the company intact." D'Amico Deposition at 37–38. It is further undisputed that Indiana has been dissolved.

■ Moreover, considering that our Court of Appeals has cautioned that when analyzing the issue of successor liability, we must be careful not to elevate form over substance, *Polius*, 802 F.2d at 78; *Philadelphia Electric Co.*, 762 F.2d at 310; *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d Cir. 1974) (Rosenn, J., concurring), *cert. denied* 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975), we reject Easton's contention that it cannot be responsible for Indiana's debts since it acquired Indiana's assets in a foreclosure sale pursuant to 13 Pa.Cons.Stat.Ann. § 9504.

As noted above, § 9504(c) requires that every aspect of the sale, including the method, manner, time, place and terms must be commercially reasonable. From the evidence in the case *sub judice*, however, it appears that the Bank orchestrated the sale of Indiana's assets to Easton in order to dispose of all of Indiana's unsecured creditors so that the Bank would not lose its priority as a secured creditor of Indiana. Indeed, it appears the Bank dictated the terms of the entire sale of Indiana assets to Easton. For example, John D'Amico, Sr. testified that the Bank dictated that Mr. D'Amico's children had to be the sole shareholders of Easton. D'Amico Deposition at 30–33. Mr. D'Amico testified that he accepted that condition "because it was the only game on the block." *Id.* at 31, 35. D'Amico further testified that he did not learn of this

condition until at or about the closing. *Id.* at 44. He further testified that he did not see any of the closing documents until he arrived at the office where the documents were all laid out for him to sign. *Id.* at 35.

George Miller, the accountant for both Indiana and Easton testified that in his 15 years working in bankruptcies, he had never "seen a bank so entrenched and single minded on what they are trying to accomplish." Miller Deposition at 34. In effect, the Bank dictated to Mr. D'Amico that he had to be the buyer and personal guarantor of Easton and his children had to be the shareholders and that he had no choice but to sign the closing documents.

■ The result of the Bank's actions is that Mr. D'Amico was able to continue as the President of the same business with essentially the same officers, directors and employees and was able to produce the same product in the same facility with the same debt to the Bank intact but with all of its debt to its unsecured creditors suddenly extinguished, all because the business had been reestablished by the Bank under a slightly modified name. In essence, Mr. D'Amico and his business received an undeserved windfall all to the detriment of Fiber–Lite and the other unsecured creditors. Such a result can hardly be viewed as commercially reasonable. Therefore, we find § 9504 not to be applicable to the facts of this case. Indeed, one could reasonably conclude that the facts in this case satisfy the fourth exception to the general rule of successor liability— that the Bank orchestrated the entire sale in order to allow its debtor, Indiana, to escape liability from all of its unsecured debt.[6]

In *Atlas*, our Court of Appeals observed that "[t]he courts that have found a de facto merger or a continuation of the enterprise have involved public policy considerations which favor compensating tort victims or appraisal rights to minority shareholders." *Atlas, Id.* The same public policy considerations which favor compensating tort victims

---

**6.** Based on the deposition testimony of John D'Amico, it appears that he was forced to join in the Bank's plan.

favor protecting the rights of unsecured creditors.

Although we distinguished the *Ross Controls* decision in our Memorandum Opinion and Order of July 26, 1994, upon further review we find that that decision supports our position. We stated the facts in *Ross Controls* in our Memorandum Opinion as follows:

> In *Ross*, Milross Controls, Inc., ("Milross") was in a bankruptcy proceeding under Chapter 7 of the Bankruptcy Code while at the same time indebted to the Internal Revenue Service ("IRS") for federal taxes. During the bankruptcy proceeding, Milross' sole shareholder and officer, Milton Ross, incorporated "The Milton Ross Company" and became its sole shareholder and officer. The IRS seized and auctioned certain items that had been owned by Milross. At the auction, the Milton Ross Company purchased most of these items. Mr. Ross subsequently incorporated Ross Controls, Inc. as an estate planning mechanism. Pursuant to an Asset–Purchase Agreement, the Milton Ross Co. sold all of its assets and liabilities to Ross Controls. Ross Controls conducted the same business as the Milton Ross Company, hired the same employees and had the same customers and supplies as the Milton Ross Company. The sole shareholder of Ross Controls was Mr. Ross' daughter. However, the daughter was not involved in running the business and received no remuneration from the company. Instead, Mr. Ross maintained control of Ross Controls. Judge Brody found that despite the fact that Milross was in bankruptcy under Chapter 7 and that its assets were sold by a third party, the IRS, both the Milton Ross Company and Ross Controls were successor corporations to Milross and liable for its tax debt. Judge Brody based her decision on the fact that Ross Controls was in the same business with the same employees, customers and suppliers as Milross and was controlled by the same individuals who controlled Milross. Fiber–Lite contends that Easton should be liable for Indiana's indebtedness since Indiana was in bankruptcy, its assets were sold by a third-party, the Bank, to Easton, and Easton does the same business as Indiana, is essentially controlled by the same directors and officers as Indiana and employs the same individuals. However, there is a major distinction between *Ross Controls* and the case *sub judice*. All *Ross Controls* held was that filing for Chapter 7 does not prevent the filing corporation from having a successor corporation. The case *sub judice*, on the other hand, involves much more than the mere filing of a bankruptcy petition. It involves the sale of the bankrupt entity's assets through the state foreclosure statute which specifically states that if the purchaser (Easton) acts in good faith and the sale of the assets is commercially reasonable, the purchaser takes free of any subordinate security interests or liens. Therefore, Easton, unlike Ross Controls, acquired the assets of Indiana free of Indiana's indebtedness, notwithstanding any possibility that Easton may be the successor to Indiana.

170 B.R. at 852–53.

Like the situation in *Ross Controls*, Indiana was in bankruptcy. Its assets were sold by a third-party, the Bank, to Easton which, as we concluded above, was the merely the continuation of Indiana. Following Judge Brody's reasoning, even though Easton purchased the assets of Indiana from a third party through the foreclosure statute, Easton would nevertheless be responsible for Indiana's debt.

In conclusion, for us to strictly adhere to the form of the transaction between Easton and the Bank under § 9504 and allow Easton to avoid its obligations on the unsecured debt it incurred while it was known as Indiana would be to ignore the substance of the transaction which placed Easton as the mere continuation of Indiana. As the continuation of Indiana, Easton is liable for the debts and obligations of Indiana to Fiber–Lite. Accordingly, we shall enter judgment in favor of Fiber–Lite and against Easton in the amount of $555,792.00.

### ORDER

The motion of the plaintiff for reconsideration is GRANTED.

The Order of this Court entered on July 26, 1994 is VACATED.

In its stead, it is ORDERED that judgment is ENTERED on the merits in favor of plaintiff Fiber–Lite Corporation and against defendant Molded Acoustical Products of Easton, Inc. in the amount of $555,792.000.

IT IS SO ORDERED.