**CONTINENTAL INSURANCE COMPANY, Appellant,**

**v.**

**SCHNEIDER, INC., Schneider Enterprises, Inc., Vanadium Enterprises Corporation, S.E. Technologies, Inc., Schneider Consulting Engineers, Schneider Technologies, Inc., S.S.I. Services, Inc., Jones Krall, Inc., Construction Rental and Supply, Inc., Energy Consultants, Inc., Seventh Street Investment Assoc. 1982, Schneider**

Holding, Inc., Industrial Art Services, Inc., E.C. Planning and Management, Inc., Schneider Baseball, Inc., Schneider Outage Maintenance, Inc., Schneider Management Co., Schneider Energy Exploration, Inc., Appellees.

Superior Court of Pennsylvania.

Argued April 10, 2002.
Filed Oct. 21, 2002.

Joseph Christof, Pittsburgh, for appellant.

Manning J. O'Connor, II, Pittsburgh, for Krall, S.S.I. Services and S.E. Technologies, appellees.

BEFORE: MUSMANNO, ORIE MELVIN and TAMILIA, JJ.

OPINION BY ORIE MELVIN, J.

¶ 1 Continental Insurance Company appeals from the trial court's entry of summary judgment in favor of Vanadium Enterprises Corporation, S.E. Technologies, Inc., S.S.I. Services, Inc., Jones Krall, Inc., and Construction Rental and Supply, Inc. (collectively "Vanadium"), and dismissal of the complaint as to those parties.[1] In a case of first impression in this Commonwealth, we are asked to determine whether the sale of assets by a secured creditor pursuant to the Uniform Commercial Code (UCC) precludes recovery by a general creditor of the predecessor entity under the doctrine of successor liability. After careful review, we conclude that a successor liability theory may be pursued by the Appellant creditor, Continental, in this case. We also conclude that genuine issues of material fact exist to prevent summary judgment. We therefore reverse and remand.

¶ 2 The trial court set forth the salient facts as follows.

From 1984 through 1990 Continental Insurance Company was the insurance carrier which provided general liability, automobile and workers' compensation insurance for as many as forty companies or divisions which were owned and controlled by Frank S. Schneider ("Schneider Companies"). Continental continues to pay claims and defend suits for occurrences which took place during the period of the insurance coverage.

1. Judgment was entered by consent against the remaining Schneider defendants on May 3, 2001.

Under the agreements between the Schneider Companies and Continental, the Schneider Companies are obligated to pay additional premiums, adjusted retrospectively, based on losses incurred and claims paid. Continental contends that it is currently owed more than $12 million in retrospective premiums.

During the middle and latter part of the 1980s, the Schneider Companies began to suffer serious financial losses. As of December 31, 1987, a significant number of the forty Schneider Companies had concluded all business activities except for the completion of existing projects. As of early 1989, the Schneider Companies owed more than $35 million to the three major Pittsburgh banks: Pittsburgh National Bank (now PNC Bank), Mellon Bank, and Equitable Bank (now National City). The banks held blanket security interest in virtually all of the assets of the Schneider Companies. They also had mortgages in various parcels of real estate.

Even though the banks had the right to immediately dispose of collateral of the Schneider Companies, on April 3, 1989 the banks and Schneider Companies executed a standstill agreement. The agreement maintained the banks' lien positions while permitting the Schneider Companies to operate until an overall strategy was developed for an appropriate disposition of the collateral. During this period, some of the Schneider Companies continued to do business under the controls imposed by the banks; some ceased operations; and others were sold.

[A]s of April 1990 Schneider Consulting Engineers, S.S.I. Services, Inc., Jones Krall, Inc. and Construction Rental and Supply, Inc. were the only Schneider Companies which were conducting any business and making any money for the Schneider Companies. After May 1990, none of the remaining Schneider Companies was anything other than an empty shell.

In early 1990, Schneider voluntarily delivered the non-real estate assets of these remaining Schneider Companies to the banks. The banks then sold these assets to a corporation (Vanadium) owned and operated by the persons who had been managing the on-going Schneider businesses.

The purchase price for the assets was less than $15 million. The banks were owed approximately $35 million. Vanadium did not assume any of the Schneider Companies' obligations to the banks. Thus, the banks will never recover most of the debt.

Trial Court Opinion, 4/15/99, at 1–3. It is undisputed that the consensual foreclosure was accomplished for several reasons: to avoid a bankruptcy proceeding, to avoid claims of other creditors, and to maximize the recovery the banks would realize from the transaction. It is also clear that Vanadium did not agree to assume the debt owed to Continental.

¶ 3 Continental filed the instant action to recover the insurance premiums owed. In essence, Continental asserts that the Vanadium companies are merely a continuation of the former Schneider businesses, and/or a *de facto* merger of the two occurred, and that Vanadium is therefore liable to it under a theory of successor liability. The trial court noted that there is no appellate court caselaw in this Commonwealth relating to whether such liability might attach where the purchaser acquired the assets from a secured creditor. After a thorough analysis, the trial court concluded that the doctrine of successor liability should not operate to defeat public policy which favors the interests of a secured creditor over that of a general credi-

tor. Summary judgment was thus entered in favor of Vanadium and against Continental.

¶ 4 This Court's scope of review is plenary when reviewing the propriety of a trial court's entry of summary judgment. *Shumosky v. Lutheran Welfare Services*, 784 A.2d 196 (Pa.Super.2001). Summary judgment is appropriate where there is no genuine issue of any essential fact and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2(1). In considering the motion, the trial court must examine the record in the light most favorable to the non-moving party, resolving all doubts against the moving party, who bears the burden of proving there is no genuine issue of material fact. *Chada v. Chada*, 756 A.2d 39 (Pa.Super.2000). An appellate court will reverse an order granting summary judgment only where there has been an error of law or clear abuse of discretion. *Murphy v. Duquesne University*, 565 Pa. 571, 777 A.2d 418 (2001).

¶ 5 It is well-settled in Pennsylvania that, "when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property." *Hill v. Trailmobile, Inc.*, 603 A.2d 602, 605 (Pa.Super.1992).

> In order to hold the acquiring, or successor, company responsible for the seller's liabilities one of the following must be established: 1) the purchaser expressly or impliedly agreed to assume the obligations; 2) the transaction amounted to a consolidation or merger; 3) the purchasing corporation was merely a continuation of the selling corpora-

tion; 4) the transaction was fraudulently entered into to escape liability; and 5) the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation.

*Id.* at 605. Continental contends that Vanadium's acquisition of the Schneider assets pursuant to Section 9–504 of the UCC does not preclude its recovery under the doctrine of successor liability.

¶ 6 Section 9–504 of the UCC provides, in relevant part, as follows.[2]

**§ 9504. Right of secured party to dispose of collateral after default; effect of disposition**

**(a) Disposition of collateral and application of proceeds.**—A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of goods is subject to Division 2 (relating to sales). The proceeds of disposition shall be applied in the order following to:

> (1) the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;
>
> (2) the satisfaction of any indebtedness secured by the security interest under which the disposition is made; and
>
> (3) the satisfaction of indebtedness secured by any subordinate security interest in the collateral[.]
>
> * * *

---

**2.** By Act of June 8, 2001, P.L. 123, No. 18 § 16, effective July 1, 2001, certain sections of Article 9 of the UCC were revised. *See now* 13 Pa.C.S.A. §§ 9610, 9611 for the content of prior Section 9504.

**(c) Manner of disposition.**—Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts.... [E]very aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

\* \* \*

**(d) Right of purchaser for value of disposed collateral.**—When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the rights of the debtor therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this chapter or of any judicial proceedings:

\* \* \*

(2) ... if the purchaser acts in good faith.

13 Pa.C.S.A. § 9504. Continental submits that despite its application to the May 1990 transaction, this provision of the UCC should not preclude recovery under the doctrine of successor liability. Continental argues that Vanadium is a mere continuation of the Schneider companies, that there was a *de facto* merger of Schneider and Vanadium, and that the May 1990 transaction was entered into fraudulently.[3] Finally, Continental asserts that a genuine issue of material fact exists as to the banks' control over the May 1990 transaction.

¶ 7 Vanadium, on the other hand, contends that proper disposition of certain Schneider assets by the secured creditor precludes recovery by Continental, partic-

ularly since the banks did not recover the full amount of the secured debt. It argues that the banks had the right to take possession of collateral pursuant to Section 9503 of the UCC and that the consensual disposition pursuant to Section 9504, which left no surplus, precludes recovery by the unsecured creditor, Continental. Thus, according to Vanadium, the rights of the secured creditors and bona fide purchasers who transferred assets in a commercially reasonable manner cannot be defeated by successor liability.

■ ¶ 8 We begin with the issue of whether the UCC operates to prevent recovery under the successor liability doctrine. Our research has revealed few cases in other jurisdictions which have had occasion to address this issue. In *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265, 274 (D.N.J.1994), the Court concluded that "nothing in the UCC supports [defendant's] argument that the 9–504 sale provides a safe harbor against successor liability claims." The Court noted that since the plaintiff was asserting a claim of successor liability, rather than seeking to enforce a lien on assets purchased at the foreclosure sale, the UCC would not preclude the plaintiff from proceeding. Similarly, in *G.P. Publications, Inc. v. Quebecor Printing–St. Paul, Inc.*, 125 N.C.App. 424, 481 S.E.2d 674, 679 (1997), the Court agreed with and expounded on the holding of the *Glynwed* Court: "[N]othing in UCC § 9–504 absolutely precludes successor liability on the theory that a new corporation is a mere continuation of a prior debtor corporation."

¶ 9 Our review of this provision of the UCC leads us to the same conclusion. Although the Code does provide very specific protections to secured creditors, there is

**3.** We note that Continental does not aver fraud on the part of the banks in the transac-

tion. *See* Reply Brief for Appellant at 6–7.

no language in Section 9504 which would bar judicial inquiry into the propriety of the transaction itself. Indeed, Section 9504 specifically contemplates that a disposition of assets by a secured creditor may not be made with unfettered discretion: "the disposition including the method, manner, time, place, and terms must be commercially reasonable." 13 Pa.C.S.A. § 9504(c). And, as did the Court in *Glynwed,* we recognize that there is a distinction between a creditor seeking to recover a debt based upon successor liability, as is Continental, and a creditor who would seek to enforce a lien on assets purchased in good faith from the secured creditor. The latter situation is specifically addressed in the UCC; the former is not. And, we also must recognize that the UCC does provide that general principles of law and equity shall supplement its provisions unless displaced. 13 Pa.C.S.A. § 1103; *G.P. Publications, supra.*

¶ 10 Accordingly, we hold that a sale pursuant to Section 9504 of the UCC does not, as a matter of law, preclude a creditor's claim against the purchaser based upon successor liability. On the contrary, in an appropriate case, such a claim may be properly pursued and, if proven, provide a basis for recovery pursuant to established law of this Commonwealth. We therefore conclude that the trial court committed an error of law in entering summary judgment on the basis that Section 9504 precludes Continental's successor liability claim.

¶ 11 This conclusion does not, however, end our inquiry, as we must now turn to the merits of those claims to determine whether Vanadium is nonetheless entitled to summary judgment. Continental asserts that successor liability should attach based upon several exceptions to the general rule that a purchaser is not responsible for the seller's debts simply because of the sale. *See Hill, supra.* First, Continental contends that Vanadium is a mere continuation of the Schneider group of businesses. Secondly, it asserts that a *de facto* merger occurred between the two companies.

¶ 12 Continental relies principally on *Fiber–Lite Corporation v. Molded Acoustical Products of Easton, Inc.,* 186 B.R. 603 (E.D.Pa.1994), *affirmed mem.,* 66 F.3d 310 (3rd Cir.1995). In *Fiber–Lite,* the plaintiff, Fiber–Lite, was a manufacturer and supplier of fiberglass products. In May 1989, Fiber–Lite was owed over $350,000 for products it had sold to Molded Acoustical Products of Indiana, Inc. (Indiana). At the time that Indiana filed a Chapter 11 bankruptcy petition in May 1989, it was also indebted to Merchants Bank which had a security interest in all of Indiana's assets.

¶ 13 In June 1989, Indiana entered into a financing agreement with the bank. At the same time, Indiana sought to avoid payments it had made to Fiber–Lite before the bankruptcy filing, and that debt was increased to over $500,000. The bank then foreclosed on Indiana's assets and caused a sale pursuant to 13 Pa.C.S.A. § 9504 to Molded Acoustical Products of Easton, Inc. (Easton).

¶ 14 Easton and Indiana shared several directors and officers and manufactured the same product, and Easton hired all the former employees of Indiana. Fiber–Lite filed the action against Easton seeking to recover the $500,000 debt, claiming that Easton was merely a continuation of Indiana. Easton responded that the disposal of Indiana's collateral pursuant to Section 9504 discharged all claims of preexisting unsecured creditors. The *Fiber–Lite* Court noted that the distinction between the facts presented and the ordinary successor liability case is that the transaction arose from a sale pursuant to

the UCC. Significantly, the Court emphasized that Section 9504 requires that every aspect of such a sale be commercially reasonable.[4] In *Fiber-Lite*, it concluded from the evidence that "the Bank orchestrated the sale of Indiana's assets to Easton to dispose of all of Indiana's unsecured creditors **so that the bank would not lose its priority as a secured creditor of Indiana.**" 186 B.R. at 610 (emphasis added). Therefore, the Court concluded that the transaction was not commercially reasonable and that Section 9504 did not apply. Further, the Court determined that the transaction placed Easton as a mere continuation of Indiana, and, as such, Easton was liable for the debt to Fiber-Lite.

¶ 15 Although *Fiber-Lite* is instructive, we find it significant that that Court concluded that the sales transaction did not meet the requirements of Section 9504 because it was not commercially reasonable. Instantly, there is no direct claim by Continental that the sale was orchestrated by the banks and was thus not commercially reasonable. Its disagreement is with Schneider and Vanadium, not the banks.[5] Continental also cites *Kaiser Foundation Health Plan v. Clary & Moore, P.C.*, 123 F.3d 201 (4th Cir.1997), which relies upon *Fiber-Lite.* In *Kaiser*, the Virginia law firm of Clary, Lawrence was suffering financial difficulties in 1990. Its debts included a judgment in favor of Kaiser for previous unpaid rent and a large secured debt to Sovran Bank. The partners then decided to close the firm and open a new one, Clary & Moore, which operated from the same office and with many of the same lawyers.

¶ 16 Sovran Bank foreclosed on Clary, Lawrence in 1991. A public foreclosure sale was held, at which Clary & Moore was the main purchaser. The sale raised almost enough money to satisfy the obligation to Sovran Bank; however, no funds remained to pay Kaiser's judgment. Kaiser then filed suit against Clary & Moore, alleging that the new firm was simply a continuation of the old and thus liable for pre-existing debts. After a review of the evidence, the Court concluded that the new law firm was simply a continuation of the old law firm, finding substantial overlap in the ownership, the officers and the directors. The Court also found significant that the business was exactly the same in all respects and further found many of the transactions, including the foreclosure auction, to be suspect rather than legitimate. Thus the Court concluded that Clary & Moore was responsible for the debts of Clary, Lawrence as a mere continuation under the doctrine of successor liability.

¶ 17 This Court has explained that a mere continuation occurs where "a new corporation is formed to acquire the assets of an extant corporation, which then ceases to exist." *Commonwealth v. Lavelle*, 382 Pa.Super. 356, 555 A.2d 218, 227 (1989)(quoting *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3rd Cir. 1974)). Thus there exists "one corporation which merely changes its form and ordinarily ceases to exist upon the creation of the new corporation which is its successor." *Id.* at 227. The primary elements of the continuation exception are identity of the officers, directors, or shareholders, and

4. Although the *Fiber-Lite* Court discussed successor liability in the context of a Section 9504 sale, it did not specifically analyze the question of whether, in Pennsylvania, such a disposition by a secured creditor precludes a claim of successor liability.

5. We also note that the parties in *Fiber-Lite* presented the Court with stipulated facts in lieu of trial. In contrast, the parties to the present dispute have provided volumes of discovery materials to support their respective positions.

the existence of a single corporation following the transfer. *Fiber–Lite, supra; Widerman v. Mayflower Transit, Inc.,* 1997 WL 539684 (E.D.Pa.1997) (citations omitted).

 ¶ 18 Similarly, when determining if a *de facto* merger has occurred, courts generally consider four factors: (1) continuity of ownership; (2) cessation of the ordinary business by, and dissolution of, the predecessor as soon as practicable; (3) assumption by the successor of liabilities ordinarily necessary for uninterrupted continuation of the business; and (4) continuity of the management, personnel, physical location, and the general business operation. *Lavelle, supra.* Although each of these factors is considered, all need not exist before a *de facto* merger will be deemed to have occurred. *Id.* We note that courts have acknowledged the difficulty in differentiating between a mere continuation of business and a *de facto* merger. *Id; see also Fiber–Lite, supra* (stating that the continuity exception has actually been subsumed by the *de facto* merger exception).

¶ 19 The trial court, in reviewing the evidence in the light most favorable to Continental, assumed that (1) the transaction resulted in a continuation of the viable Schneider enterprises through continuity of management, personnel, physical location, assets, and general business operations; (2) there was continuity of ownership (although noting that Vanadium disputed this assumption); (3) the Schneider companies ceased business operations at the time of the transaction; and (4) Vanadium assumed only those Schneider obligations which were necessary for the uninterrupted continuation of normal business operations. The trial court further noted that Frank S. Schneider was the sole shareholder and chief operating officer of the Schneider Companies prior to the sale, but is not a shareholder of Vanadium. However, the trial court went on to accept as true that the transaction "accomplish[ed], in substance, the continuation of the Schneider enterprise for a new corporate group under modified corporate names and controlled by Schneider and his affiliates." Trial Court Opinion, 4/19/99, at 12 (citation omitted). It further stated that "[t]here is a factual dispute as to whether there is continuity of ownership and control." *Id.* at 3.

¶ 20 In its opinion, the trial court recognized these factual assumptions and inferences as supportive of Continental's position. Indeed, these identifiable factual disputes mirror the elements required to establish the continuation and/or *de facto* merger theories to support successor liability. However, the trial court went on to conclude that, as a matter of law, Section 9504 of the UCC precludes a creditor from proceeding on a theory of successor liability; it thus never reached the question of whether the factual disputes constitute genuine issues sufficient to defeat the summary judgment motion.

¶ 21 We have reviewed these disputed issues of fact in the context of the elements required by the caselaw to support a claim of successor liability. For example, there is clearly a genuine dispute over continuity of ownership and control, which are relevant factors to both exceptions claimed by Continental. Additionally, as in *Kaiser*, the Vanadium companies operated substantially the same businesses serving the same clients and had the same employees working in the same offices as the former Schneider companies. As such, there clearly exists genuine issues of material fact as to whether successor liability may provide a basis for recovery by Continental.

¶ 22 Therefore, having already determined that the legal ruling barring pursuit of a successor liability theory in a UCC claim constitutes an error of law, we are constrained to conclude that the existing genuine issues of material fact identified by the trial court operate to preclude summary judgment in Vanadium's favor.[6] That is not to say, of course, that Continental will necessarily prevail on its theory at trial. However, resolution of these factual issues is a matter left for the factfinder based upon all of the relevant evidence. *See Bostick v. Schall's Brakes and Repairs, Inc.*, 725 A.2d 1232, 1239 (Pa.Super.1999), *appeal denied*, 560 Pa. 694, 743 A.2d 912 (1999)(reversing order granting summary judgment and remanding based upon insufficient evidence on whether second corporation was mere continuation of first; refusing to give "silent judicial sanction for corporations to form successor entities in an effort to shelter their financial responsibilities and debts.").

■ ¶ 23 In so ruling, we do not ignore the important considerations of public policy which the trial court carefully analyzed. It cannot be disputed that one of the purposes of the UCC is to protect and give preference to the secured creditor over the unsecured creditor. *See* Trial Court Opinion, 4/15/99, at 19. It is also true that Section 9504 also provides protection for a bona fide purchaser of assets from such a secured creditor. However, we reiterate that Continental is seeking to recover from Vanadium as a successor corporation to

Schneider; it is not attempting to enforce a lien on assets purchased pursuant to the foreclosure sale. Continental is making no claim against the banks. As such, it is difficult to envision how the banks' prior security interest in the Schneider companies' assets should require further protection at this juncture.

■ ¶ 24 Simply because the underlying transaction proceeded pursuant to the UCC does not prevent inquiry into the propriety of the sale. Instead, where appropriate, "we must look at the substance of the transaction [under the UCC] to determine its true nature." *G.P. Publications, supra*, 481 S.E.2d at 679–80. This we have concluded must be accomplished upon remand so that the genuine issues of material fact may be resolved by a factfinder.

¶ 25 Accordingly, based upon the foregoing, the order of the trial court must be reversed, and this case remanded for further proceedings consistent with this decision.

¶ 26 Order reversed; case remanded. Jurisdiction relinquished.

---

**6.** Continental also asserts that the fraud exception is applicable to permit it to recover on its theory of successor liability. We have reviewed the cases cited to support this contention, namely *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303 (3rd Cir.1985), *cert. denied*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985)(finding both *de facto* merger and express assumption of obligation existed to impose successor liability) and *Hill v. Trailmobile, supra* (recognizing new "product-line" exception to successor liability), as well as *Fiber–Lite, supra* (finding that the sales transaction did not meet the requirements of Section 9504 because it was not commercially reasonable). We find each of these cases to be clearly distinguishable and not supportive of the argument that the fraud exception has been established on this record. *See* n. 3, *supra*. We thus agree with the trial court's determination on this particular issue.