OPINION OF THE COURT
JORDAN, Circuit Judge.
Essex Insurance Company (“Essex”) appeals from a declaratory judgment entered against it by the United States District Court for the Middle District of Pennsylvania after a bench trial, obligating it to defend and indemnify Greenway Center, Inc. (“GCI”) in a wrongful death action brought against GCI in the Monroe County Court of Common Pleas by Annette Maione. The basis for the District Court’s judgment was its conclusion that a defacto merger occurred between GCI and Winco Acquisitions, Inc. d/b/a Greenway Center (“Winco”). Winco is the former operator of the Greenway Center (the “Center”), a drug and alcohol treatment facility in Hen-ryville, Pennsylvania, and the insured on a 1997 policy issued by Essex.[1] Because we conclude that GCI is not a successor to Winco under Pennsylvania law, we will vacate the District Court’s judgment and remand for further proceedings consistent with this opinion.
I. Background
On June 24, 1997, Mark Willet passed away the day after having checked into the Center for treatment of his drug and alcohol addictions. At the time of Willet’s death, Winco operated the Center. However, as discussed in more detail below, GCI, which was incorporated in 1998, eventually took over the Center’s operations. In 1999, Maione brought a wrongful death action against GCI in connection with her husband’s death.
*350 GCI filed the instant lawsuit against Essex and Maione, individually and in her capacity as the administrator of her husband’s estate, in the Monroe County Court of Common Pleas in December of 2008, seeking a declaratory judgment that Essex is obligated to indemnify and defend GCI in Maione’s wrongful death action. The matter was removed to the District Court in 2004. After a bench trial on April 19, 2005, the Court found in favor of GCI, holding that the state court in the underlying negligence action had already found GCI to be a successor of Winco and that issue preclusion prevented Essex from challenging that finding. We reversed on appeal, holding that issue preclusion was inapplicable, and remanded for a determination as to whether GCI was a successor in interest to Winco. Greenway Ctr. Inc. v. Essex Ins. Co., 475 F.3d 139 (3d Cir.2007).
On remand, the District Court held a supplemental bench trial and, in an August 6, 2008 memorandum opinion, 2008 WL 3165874, the following facts emerged. Winco operated the Center as an alcohol and drug rehabilitation center pursuant to a license issued by the Pennsylvania Department of Health (“DOH”). After Wil-let’s death, the DOH revoked Winco’s license, and the Center was shut down in November 1997. Winco had previously filed for bankruptcy in June of 1997 and had developed a reorganization plan pursuant to which all of its stock was to be vested in or reissued to GCI. Ultimately, however, no stock was ever transferred from Winco to GCI. Furthermore, GCI did not purchase any of Winco’s assets.
Heath Management Associates (“HMA”), a management company, was authorized by the Bankruptcy Court to operate the Center during the transition period. HMA began running the Center in February 1998 pursuant to a management agreement with Winco, and reopened the Center in March 1998 “with the aim of eventually turning the business over to GCI.” (App. at 16.) Financing for the Center’s operation was provided by Via-care. HMA, Yiacare, and GCI all had the same individuals serving on their boards of directors. However, none of the shareholders, officers, or directors of Winco were shareholders, officers, or directors of GCI.[2]
HMA became the holder of Winco’s license, though the license remained in Win-co’s name. Since most of Winco’s employees left the Center after it closed, HMA hired new employees upon reopening with the exception of two individuals from the previous administration. While running the Center, HMA did not take any direction from any of Winco’s stockholders or owners. In fact, it was prohibited from doing so by the DOH, which only permitted the Center to reopen on the condition that Winco’s management be prohibited from participating in the Center’s operations.[3] Greenway Ctr. Inc., 475 F.3d at 143 n. 3. In other words, Winco’s management was forbidden to, and in fact never again did, play any role in running the Center after it was shut down.
The boards of HMA, Viacare, and GCI met between 1998 and 2000 to discuss the Center’s operations. No one from Winco was present at those meetings, and thus GCI’s executive director made decisions for Winco. Winco was the licensee and the named insured on relevant insurance policies during this time period, and it *351 maintained bank accounts to pay employees, even though it played no role in running the Center. Additionally, Winco remained a party to contracts with various counties that referred patients to the Center for court-supervised treatment so that referrals pursuant to those contracts could continue uninterrupted. In short, after HMA took over operations, Winco essentially existed only as a shell, its shareholders had abandoned the corporation and other entities ran the business, but Winco was not dissolved because of the pendency of Willet’s state court suit and “because it was convenient to allow Winco to remain a party to third party contracts that were serviced by Greenway Center.” (App. at 17.) By the time Maione sued Winco— after suing GCI and presumably realizing that she had mistakenly sued the wrong-defendant — the statute of limitations had run and her lawsuit against Winco was dismissed as time-barred. Essex defended Winco in that action. The persistent efforts to find GCI to be Winco’s successor appear to stem from Maione’s initial mistake in suing the improper defendant.
On June 28, 2000, GCI became the holder of the license to run the Center. Regardless of who was operating the facility, the Center was always known as the Greenway Center; its business did not change; it was always located on the same premises, and its letterhead and phone number did not change.
The District Court, applying Pennsylvania law, held that a de facto merger had occurred between Winco and GCI, such that GCI could take advantage of Essex’s insurance policy. In making that determination, the Court considered four factors set forth under Pennsylvania law for assessing a claim of de facto merger: “(1) continuity of ownership; (2) cessation of the ordinary business by, and dissolution of, the predecessor as soon as practicable; (3) assumption by the successor of liabilities ordinarily necessary for uninterrupted continuation of the business; and (4) continuity of the management, personnel, physical location, and the general business operation.” (App. at 15 (quoting Continental Ins. Co. v. Schneider, Inc., 810 A.2d 127, 135 (Pa.Super.Ct.2002).))
The Court held that the first factor, continuity of ownership, was met because HMA “had in effect been running Winco to the extent that it needed running” and the shareholders of HMA are identical to those of GCI. (App. at 19.) The Court found that the second factor, earliest practicable dissolution, weighed in favor of de facto merger because, even though Winco was never officially dissolved, “it has no shareholders, no business and does nothing.” (App. at 19.) The Court found that the third factor, assumption of liabilities necessary for continuation of business, weighed in favor of de facto merger because the Center’s contracts remained in Winco’s name but were carried out by HMA and GCI. Finally, the Court found that the fourth factor, continuity of management and general business operation, weighed in favor of merger because there was a continuity “in the physical location and general business operations of the Greenway Center” and a continuation of personnel to a certain extent. (App. at 20.) The Court accordingly entered declaratory judgment in favor of GCI, obligating Essex to defend and indemnify GCI in Maione’s wrongful death action based on its finding that a de facto merger had occurred.[4] Essex timely appealed.
*352 II. Discussion[5]
“We review a district court’s findings of fact following a bench trial under the clearly erroneous standard.” Am. Soc’y for Testing & Materials v. Corrpro Cos., Inc., 478 F.3d 557, 566 (3d Cir.2007). In contrast, we exercise plenary review over a district court’s legal conclusions. Id. Since this action is governed by Pennsylvania law, we must “apply existing state law as interpreted by the state’s highest court in an effort to predict how that court would decide the precise legal issues before us.” See Koppers Co. v. Aetna Cas. and Sur. Co., 98 F.3d 1440, 1445 (3d Cir.1996). If the highest state court has not spoken on the pertinent issue, we may look for guidance to, among other things, decisions of state intermediate appellate courts and decisions of federal courts interpreting that state’s law. Id.
The general rule in Pennsylvania is that, when one company sells all or substantially all of its assets to another company, the purchasing company is not liable as a successor. Continental Ins. Co. v. Schneider, Inc., 582 Pa. 591, 873 A.2d 1286, 1291 (2005). One exception to that rule occurs when the purchasing company is “merely a continuation of the selling corporation,” id. at 1291, also known as a de facto merger, Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 468 (3d Cir.2006) (noting that courts treat de facto merger and continuation identically). A de facto merger or mere continuation occurs when a new eor-poration is formed to acquire the assets of or take over a second corporation, which then ceases to exist. See Schneider, 810 A.2d at 134-35.
Again, as the District Court recognized, Pennsylvania law requires courts to consider the following four factors in determining whether a de facto merger has occurred between two entities, “(1) continuity of ownership; (2) cessation of the ordinary business by, and dissolution of, the predecessor as soon as practicable; (3) assumption by the successor of liabilities ordinarily necessary for uninterrupted continuation of the business; and (4) continuity of the management, personnel, physical location, and the general business operation.” Id. at 135; see also Berg Chilling, 435 F.3d at 468-69. In Berg, we explained that the first factor, continuity of ownership, is the most important factor in the analysis, and that the absence of any continuity of ownership therefore creates a “strong presumption against imposing successor liability.” 435 F.3d at 469. Recently, the Pennsylvania Superior Court confirmed that continuity of ownership is “a key element that must exist in order to apply the de facto merger doctrine, since in the absence of a transfer of stock for assets the consequence of the transaction is not the functional equivalent of a merger.” Fizzano Bros. Concrete Prods., Inc. v. XLN, Inc., 973 A.2d 1016, 1020 (Pa.Super.Ct.2009).[6] “The objective *353 of [the continuity of ownership] requirement is usually to identify situations in which shareholders of a seller corporation unfairly attempt to impose their costs or misdeeds on third parties by retaining assets that have been artificially cleansed of liability.” Berg, 435 F.3d at 469.
The District Court erred in concluding that a de facto merger occurred between GCI and Winco because there is no evidence of continuity of ownership. GCI never purchased, any of Winco’s assets and no stock was ever transferred from Win-co’s shareholders to GCI’s shareholders. Furthermore, Winco’s owners never participated in running the Center after it was closed in November 1997 and, importantly, were prohibited from doing so as a condition of the reopening of the Center under HMA’s management. The record does not show that the ownership of Winco passed to HMA in any fashion.
The District Court found a continuity of ownership between HMA and Winco “to a certain extent” because HMA ran “Winco to the extent that it needed running.” (App. at 19.) Presumably, the District Court was referring to the fact that HMA ran the Center after it reopened and carried out contracts to which Winco was still a party. That does not mean, however, that the officers and directors of HMA somehow became owners of Winco. And, to the extent that overlapping management is meaningful, none of Winco’s management played any role at all in the Center’s operation once it reopened. Accordingly, there was no continuity of ownership between Winco and HMA, and the fact that GCI and HMA share the same management is irrelevant.[7]
GCI asserts that the “gradual metamorphoses [where] the operations of [the Center] went from Winco to HMA to GCI over a course of time” establishes continuity of ownership. (Appellee’s Ans. Br. at 21.) Although it is true that HMA, and GCI thereafter, assumed operation of the Center, there was no continuity of ownership between Winco and HMA (and thus, GCI) — an important distinction. In the absence of a stock transfer, asset purchase, or any other evidence establishing that the owners of Winco became the owners of GCI, there is no basis for finding a continuity of ownership.
Although our conclusion is sufficient to preclude application of the de facto merger doctrine, see Fizzano, 973 A.2d at 1020 (concluding that “since there was no continuity of ownership, the de facto merger doctrine does not apply”), we also note that the remaining factors — earliest practicable dissolution of the predecessor, assumption by the successor of the necessary liabilities, and the continuity of the management and general operations — do not support a finding of de facto merger. First, regardless of whether Winco conducted any business, it was never dissolved and was capable of responding to the action Maione filed against it. Second, although GCI serviced several of Winco’s contracts, GCI did not purchase Winco’s service agreements or assume Winco’s liabilities. Finally, although the general business operations and physical location of the Center did not change under GCI’s ownership, the management was new and the personnel was, for the *354 most part, different from personnel under Winco’s management. Taking the four factors together, we cannot conclude that GCI is a continuation of Winco and, thus, the District Court’s conclusion to the contrary was erroneous.[8] Since GCI is not Winco’s successor, GCI cannot take advantage of Essex’s insurance policy on that basis.
III. Conclusion
No de facto merger or continuation occurred between GCI and Winco that would permit GCI to take advantage of Essex’s insurance policy as Winco’s successor. We must therefore vacate the District Court’s declaratory judgment and remand for further proceedings consistent with this opinion.

. The policy was issued on February 3, 1997 and had a term of one year.

. HMA, GCI, and Winco did, however, have the same attorney.

. Although the District Court did not expressly acknowledge this fact, it is apparent from the record and our prior opinion in this matter.

. The District Court rejected GCI’s other theories of recovery. Those issues are not before us on appeal.

. This case was removed to District Court pursuant to 28 U.S.C. § 1441. The District Court's jurisdiction was based upon diversity because the parties are citizens of different states — GCI is a citizen of Pennsylvania while Essex is a citizen of Delaware and Virginia and Maione and Willet are both citizens of New Jersey — and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332. We have jurisdiction over this appeal based on 28 U.S.C. § 1291.

. In its supplemental brief, GCI claims that Fizzano is somehow irrelevant to our analysis, because Fizzano concerned an asset purchase while no asset purchase occurred in this case. Fizzano is the Pennsylvania Superior Court's latest pronouncement on the de facto merger doctrine, and its legal principles are applicable here even if there are factual differences in the cases. Indeed, GCI itself cites cases in its answering brief as applicable law on the issue which themselves concern asset purchases. Nor does Fizzano conflict with the *353 Pennsylvania Superior Court's earlier decision in Schneider, 810 A.2d 127 (Pa.Super.Ct.2002). Instead, Fizzano clarified Schneider, explaining that Schneider emphasized “the importance of continuity of ownership in the de facto merger analysis.” Fizzano, 973 A.2d at 1021.

. GCI's reliance on the bankruptcy plan, which sought to transfer Winco’s stock to GCI, is misplaced, not least because there was no such transfer.

. At the end of its analysis, the District Court focused on the fact that “GCI maintained the insurance in Winco's name even when Winco was clearly doing nothing to operate the business.” Although it may have appeared equitable to the Court to permit GCI to recover insurance proceeds from Essex when GCI was running the Center, Willet's death took place in June of 1997, when Winco was running the Center. Furthermore, the insurance policy in question was issued to Winco for a term of one year, beginning on February 3, 1997. Accordingly, that particular policy would have expired before HMA — and certainly before GCI — began running the Center.