

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-31-2006

# Berg Chilling Sys v. Hull Corp

Precedential or Non-Precedential: Precedential

Docket No. 04-3589

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Berg Chilling Sys v. Hull Corp" (2006). *2006 Decisions.* Paper 1657.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1657

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-3589

BERG CHILLING SYSTEMS, INC.,

Appellant

v.

HULL CORPORATION;
SP INDUSTRIES, INC.

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

District Court No. 00-CV-5075
District Court Judge: The Honorable Berle M. Schiller

Argued September 26, 2005

Before:  ALITO, AMBRO, and LOURIE[*], Circuit Judges

(Opinion Filed: January 31, 2006 )

JOHN J. SOROKO (Argued)
PATRICK J. LOFTUS
JAMES H. STEIGERWALD
Duane Morris LLP

_____

[*] Honorable Alan D. Lourie, Judge of the United States
Court of Appeals for the Federal Circuit, sitting by designation.

1650 Market Street
One Liberty Place, 39th Floor
Philadelphia, PA 19103-7396

*Counsel for Appellant*

MICHAEL O. ADELMAN (Argued)
MICHAEL P. DALY
KATHRYN E. BISORDI
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996

*Counsel for Appellees SP Industries, Inc.*

---

OPINION OF THE COURT

---

ALITO, <u>Circuit Judge</u>:

Berg Chilling Systems ("Berg") appeals a judgment entered by the United States District Court for the Eastern District of Pennsylvania. In the earlier proceedings, Berg sought a judgment rendering SP Industries ("SPI") liable for breach of contract, most recently based on the theory that SPI assumed liability when it purchased the assets of an entire division of the Hull Corporation ("Hull"), the original party to the contract. Because we find that SPI did not assume Hull's contractual liability to Berg under any of the exceptions to the traditional corporate rule of successor non-liability, we affirm.

I.

The tangled history of this case began in 1995, when Berg, a Canadian corporation, contracted with a Chinese company, Hua Du Meat Products Company (**"**Huadu"), to provide an industrial food freeze-drying system (the "Huadu Contract"). The system included several components that Berg planned to acquire from subcontractors and suppliers. One of these subcontractors was

2

Hull, a Pennsylvania entity, with whom Berg eventually contracted to design, engineer, manufacture, test, and modify two freeze dryers. The purchase agreement between Berg and Hull (the "Purchase Agreement") stipulated that the two freeze dryers conform to particular "through-put" specifications, an industry term referring to the dryers' ability to process a certain volume of food at a high quality level within a 24-hour period.

All did not go according to plan. Initially, various logistical and timing issues plagued the manufacture and delivery of the freeze dryers before they were eventually installed at Huadu's facility in China in April 1997, and prepared for trial runs. Then, the freeze dryers failed a preliminary test administered by a Hull service technician, leading Huadu to send a list of concerns to Berg, which then forwarded the list to Hull. The Hull technician supervising the testing left China without running any performance tests. These tests would have held the freeze dryers to even more stringent standards than did the failed start-up test, and satisfaction of the performance tests was required by the Huadu Contract. Frustrated by Hull's apparent lack of cooperation, Huadu threatened to cancel the contract; Berg, in turn, threatened to sue Hull.

In an effort to salvage the project and persuade Huadu not to terminate the contract, representatives of Berg and Hull traveled to China in October 1997 to negotiate a compromise. The result was an agreement among Huadu, Berg, and Hull, modifying certain terms in the original contract (the "Modified Agreement"). The Modified Agreement provided, among other things, that Berg and Hull would arrange, at their own cost, modifications to the freeze dryers so they would meet the through-put requirements of the original Huadu contract. It also obligated Hull to perform technical work, assembly work, testing work, and production work on the freeze dryers according to engineering plans prepared by a Hull engineer. March 1998 was set as the date by which modifications would be completed and Huadu would grant final acceptance.

Meanwhile, in August 1997, Hull began negotiating a business deal with SPI, a Delaware corporation with its principal place of business in New Jersey. The transaction, structured as an asset purchase agreement, proposed to sell to SPI all assets,

properties, rights, and businesses related to Hull's Food, Drug and Chemical ("FDC") Division. Hull's FDC Division included its freeze dryer production capacity, and consequently its rights and obligations under the Modified Agreement and the Purchase Agreement. At the time of contract negotiations, Hull had at least two other Divisions: the Emission Monitoring Systems Division and the Vacuum Components Division.

Hull and SPI entered into an asset purchase agreement dated August 25, 1997 ("Asset Purchase Agreement" or "APA"), which closed approximately one week after Huadu, Berg, and Hull signed the Modified Agreement. SPI's President and CEO, Jack Partridge, indicated that SPI specifically intended to acquire Hull's FDC Division as an ongoing business. See Berg Chilling Sys., Inc. v. Hull Corp., No. 00-5075, 2003 WL 21362805, at *4 (E.D. Pa. June 10, 2003) (hereinafter Berg I). SPI planned to combine the newly-acquired FDC Division with its own VirTis Division, which manufactured freeze dryers for research; indeed, a public release by SPI referenced a "merger agreement between the FDC division of Hull and the VirTis division of SP Industries." (A1042).

Several particular provisions of the APA are relevant to our discussion. The first is a list of purchase assets, detailed in Article 1.2, which included "all contracts and agreements, including, without limitation, sales orders and sales contracts." (A962-965). The second provision at issue is Section 7.8, entitled Product Warranties, which states that:

> Purchaser will, as appropriate, agree to repair (at the Real Estate or as necessary, at the location of the customer) or accept returns of products of the Business shipped by [Hull] on and prior to the Closing Date ... which are defective or which fail to conform to the customer's order in accordance with the following provisions (but [SPI] does not hereby assume any liability to any third party claimant. ...)

(A986). Third, the APA's choice of law provision, set forth in Section 10.6, stated that the "agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of

New Jersey applicable to contracts made in that State." (A994). Finally, the purchase price of the contract indicated in Section 3.1 was fixed as the sum of six million dollars cash and the aggregate book amount of assumed liabilities. (A966).

As the APA's closing date approached, the remaining work on the freeze dryers for Berg was a cause of concern for all parties. After the asset transfer, it would have been impossible for Hull to complete its obligations under the Modified Agreement because Hull retained neither the personnel nor the capacity for the required work. Hull and SPI resolved the issue by simultaneously entering into a "side letter agreement" in which they agreed that SPI would complete the remaining design modifications and repairs to the freeze dryers, and that Hull would reimburse SPI for a portion of its expenses. Berg Chilling, 369 F.3d at 750. The letter provided that "[e]xcept as amended hereby, the terms and provisions of the Asset Purchase Agreement shall remain in full force and effect." (A1098). Both Hull and SPI considered SPI's efforts to fix the freeze dryers to be warranty work, as defined and covered by Section 7.8 of the APA, and the side letter agreement made no changes to that section. Meanwhile, Berg attempted to assuage its own concerns about the project by sending a letter to Hull, inquiring about "the transfer of liabilities, and specifically who will be carrying the full financial responsibility for this project." (A1045). Hull responded by indicating that "[i]f Hull's freeze drying division should be transferred to another entity, Hull's responsibility will of course be assumed by the successor." (A1043). At the time Hull made this representation, the APA was still under negotiation, and there was no guarantee that any asset transfer would ultimately take place. There is no indication that Hull ever informed SPI about its assurances to Berg, and Berg did not discuss the matter directly with SPI after the asset transfer was complete.

After the APA closed, SPI renamed Hull's former FDC Division "Hull Company Division," and marketing materials called the Hull Company Division the "continuation" of Hull. (A725-27, 737-39). Key former employees of Hull, including the major players in the Huadu Contract, remained involved in the project. SPI named Lewis Hull, Hull's chairman, as honorary chairman of the Hull Company Division, and employed John Hull as a

5

consultant to the Huadu project. Both men lacked any power to legally bind SPI. Others, including Hull's chief engineer, continued to perform design and engineering work on the Huadu Project pursuant to the Modified Agreement. The Division's first order of business was to complete the remaining work on the Huadu freeze dryers to bring them into compliance with the contract.[1]

SPI's efforts to bring the freeze dryers up to performance standards were ultimately unsuccessful. Consequently, Huadu filed an international arbitration action against Berg for breach of contract in March, 1999, pursuant to its rights under the Huadu Contract, as modified by the Modified Agreement. Berg requested that Hull participate in a joint defense in the proceedings, but Hull refused to do so. Although the arbitrators found that the only deficiency in the freeze-drying system was the freeze dryers themselves, they found that Berg bore full responsibility to Huadu, and deemed Hull's liability to be outside the scope of arbitration. Berg Chilling Sys. v. Hull Corp., 369 F.3d 745, 752 (3d Cir. 2004). Approximately one year later, Berg informed SPI of the arbitration for the first time. Ultimately, Huadu won an arbital award of approximately $2.5 million against Berg, which the parties settled for a total of $1,000,000 in cash, and $650,000 in equipment value (Huadu kept the freeze dryers).

While the arbitration continued, Berg filed suit against Hull and SPI in the United States District Court for the Eastern District of Pennsylvania, asserting claims for breach of contract, breach of express warranty, breach of implied warranty, and indemnity and contribution. Hull and SPI, in turn, each filed cross-claims against each other for indemnity or contribution After a bench trial in January 2003, the District Court determined that Berg, Hull, and SPI were equally at fault for breaching the agreements with Huadu. Accordingly, the court apportioned the $1,000,000 arbitration

_____

[1] Berg intimates that the ultimate failure of the freeze dryers to perform to Huadu's specifications was due to SPI's faulty design, not to Hull's. We, however, believe that it is more accurate to characterize SPI's work as attempting to fix flaws -- including design flaws -- in Hull's original work.

6

settlement equally but separately among Berg, Hull, and SPI. The District Court did not allow Berg to recover any portion of the $650,000 equipment credit because Berg did not show that it accurately reflected the actual value of the equipment, nor did it take into account the costs Berg would have incurred in retrieving the equipment. The District Court also found against both Hull and SPI on their respective cross-claims for indemnification.

Berg and SPI appealed, and this Court reversed, finding that Section 7.8 of the APA precluded a finding that SPI was liable to Berg on the basis of the APA. Thus, based on that indemnification clause, Hull was determined to be solely liable to Berg for the $1,000,000 cash settlement, the $650,000 equipment credit for the freeze dryers, and attorneys' fees and costs incurred in the arbitration proceedings. Berg Chilling, 369 F.3d at 766. This Court also found Hull liable to SPI for indemnification, including attorneys' fees and costs. The District Court was directed on remand to determine whether to void Section 7.8 as against public policy, and whether SPI is liable to Berg under the doctrine of successor liability.

On remand, Berg contended that SPI is liable for Hull's breach of contract as a successor corporation, either because the substance of their transaction -- despite the label of the APA -- was truly a *de facto* merger between SPI and Hull, or because the APA rendered SPI a "mere continuation" of Hull. Initially, the District Court decided that there is no material difference between New Jersey and Pennsylvania successor liability law, and therefore did not decide which state's law governed the successor liability issue. Ultimately, the District Court found that SPI did not succeed to Hull's liability under the Modified Agreement. Berg II, at *4. Hull Corporation did not participate in the remand proceedings, nor does it participate in this appeal, as it is no longer in business and has no assets. Berg II, at *2.

Next, Berg argued that Section 7.8 was void as contrary to public policy, both according to two New Jersey statutes and to New Jersey common law. Berg Chilling Sys. v. Hull Corp., No. 00-5075, 2004 WL 1749174, at *1 (E.D. Pa. Aug. 3, 2004) (hereinafter Berg II). First, the District Court summarily rejected Berg's argument that N.J. Stat. § 2A:40A-1 and N.J. Stat. §

7

2A:40A-2 prohibited enforcement of Section 7.8. The Court reasoned that the statutes in question applied only to negligence disclaimers and were thus irrelevant to a breach of contract action. Moreover, the Court found the statutes inapplicable because they only apply in situations where damages are caused by the contracting party's sole negligence -- which is not the case here, as this Court previously held that Hull was also liable. The District Court similarly rejected Berg's argument that Section 7.8 contravened New Jersey common law deeming exculpation of professionals to be against public policy. The District Court found cases on which Berg relied to be inapplicable to the situation in this case. Berg II, at *3.

## II.

We exercise plenary review over the District Court's legal determinations, Shire U.S. Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003), and review the District Court's findings of fact for clear error, United States v. Bell, 414 F.3d 474, 478 (3d Cir. 2005). In order to constitute error, a factual finding must be "completely devoid of minimum evidentiary support displaying some hue of credibility." Berg Chilling Sys. Inc. v. Hull Corp., 369 F.3d 745, 754 (3d Cir. 2004) (internal citations and quotations omitted).

We must first determine which state's substantive law governs, a question over which we exercise plenary review. See Garcia v. Plaza Oldsmobile Ltd., 421 F.3d 216, 219 (3d Cir. 2005). To resolve the issue of what law to apply to Berg's successor liability claims, we look to the choice of law rules of the state of Pennsylvania, because in an action based on diversity of citizenship jurisdiction, we must apply the substantive law of the state in which the District Court sat, including its choice of law rules. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Yohannon v. Keene, 924 F.2d 1255, 1264 (3d Cir. 1991). Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as "depecage." See, e.g., Compagnie des Bauxites v. Argonaut-Midwest Ins. Co., 880 F.2d 685, 691 (3d Cir. 1989).

## A.

Initially, we must determine whether a true conflict exists between the application of New Jersey law and Pennsylvania law. According to conflicts of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a "false conflict," and the Court should avoid the choice-of-law question. See Williams v. Stone, 109 F.3d 890, 893 (3d Cir. 1997); Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 813 (3d Cir.1994) (applying Pennsylvania choice-of-law rules). The District Court determined that there was no material difference between New Jersey and Pennsylvania successor liability law, and therefore did not decide which state's law governs the successor liability issue. Berg II, at *4. Berg now argues that New Jersey law controls, because courts in that state find successor liability under less compelling circumstances, but asserts that applying Pennsylvania law is not fatal to its claim; SPI contends that choice of law analysis is unnecessary, but argues in favor of Pennsylvania law if the Court is obligated to choose.

Choice of law analysis is necessary because Berg's claim is more likely to fail under Pennsylvania law. District Courts applying Pennsylvania law hold that a "*de facto* merger or consolidation cannot exist unless the shareholders of the predecessor become shareholders of the successor through the successor's use of stock in payment for the predecessor's assets." Glynwed, Inc. v. Plastimatic, Inc., 869 F. Supp. 265, 277 (D.N.J. 1994) (noting the Pennsylvania law before proclaiming the opposing view under New Jersey law); see also Forrest v. Beloit Corp., 278 F. Supp. 2d 471, 477 (E.D. Pa. 2003), rev'd on other grounds, 2005 WL 2245640 (3d Cir., Sept. 15, 2005) (finding that *de facto* merger claim failed as a matter of law because there was no stock transfer between the so-called predecessor and successor corporations); Tracey v. Winchester Repeating Arms Co., 745 F. Supp. 1099, 1109-10 (E.D. Pa. 1990) (finding continuity of stock ownership to be the "essential element" to application of de facto merger exception). Thus, as the District Court noted, "the lack of a stock transfer is probably fatal to Berg's *de facto* merger argument" under Pennsylvania law. Berg II, at *4 n.5.

Berg has a much better chance under New Jersey law because its courts have adopted a broader standard of successor liability that deemphasizes continuity of shareholder interest. See, e.g., Woodrick v. Jack J. Burke Real Estate, 306 N.J. Super. 61, 74-77, 703 A.2d 306 (App. Div. 1997). This line of cases elevates the intent of the contracting parties to primary importance, id., and may disregard entirely whether the selling corporation continues in business, see Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F. Supp. 2d 324, 337 (D.N.J. 2002). In Koch, the District Court allowed for the possibility that a corporation purchasing an entire division may meet the requirements of a "mere continuation," despite the fact that all other divisions of the selling corporation remain extant and viable. Id. According to that court, it "makes little sense" to consider whether the selling corporation continues in business "in the context of modern business, where a corporation might easily sell an entire division and carry on dutifully in another area." Id. Because SPI, like the corporation in Koch, also purchased an entire division of another corporation, Koch would be an influential, perhaps dispositive, case if we were to apply New Jersey law. Thus, because Pennsylvania and New Jersey courts focus on such disparate elements in determining successor liability, we must engage in choice of law analysis.

B.

Once it is determined that an actual conflict exists, Pennsylvania follows a "flexible rule," that "permits analysis of the policies and interests underlying the particular issue before the court." Griffith v. United Air Lines, 416 Pa. 1, 203 A.2d 796 (1964); see also Myers v. Commercial Union Assurance Cos., 506 Pa. 492, 485 A.2d 1113 (1984) (reiterating importance of "policies and interests" analysis); Cipolla v. Shaposko, 439 Pa. 563, 267 A.2d 854 (1970) (advising that relevant factors be viewed qualitatively, not quantitatively). The federal courts of the Third Circuit have interpreted Griffith to mean that a court applying Pennsylvania law should use the Second Restatement of Conflict of Laws as a starting point, and then flesh out the issue using an interest analysis. See Compagnie des Bauxites, 880 F.2d at 688; Melville v. American Home Assurance Co., 584 F.2d 1306, 1308-09 (3d Cir. 1978); American Contract Bridge League v. Nationwide Mut. Fire Ins. Co., 752 F.2d 71, 74 (3d Cir. 1975); see

also <u>United Brass Works, Inc. v. American Guarantee & Liability Ins. Co.</u>, 819 F. Supp. 465 (W.D. Penn. 1992) (providing historical analysis of federal courts' determination of Pennsylvania choice of law approach).

The Second Restatement dictates different approaches depending on the substantive law at issue. Thus, to properly apply the Second Restatement and remain true to the spirit of Pennsylvania's "flexible approach," we must first characterize the particular issue before the court as one of tort, contract, or corporate law -- or some hybrid -- in order to settle on a given section of the Restatement for guidance. <u>See</u> <u>Ruiz v. Blentech Corp.</u>, 89 F.3d 320, 324 (7th Cir. 1996) ("To properly apply the Second Restatement method, a court must begin its choice-of-law analysis with a characterization of the issue at hand in terms of substantive law."). Here, the practical effect of characterizing successor liability may be significant. This case arose from the effects of SPI's purchase of an entire division of the Hull Corporation, and the Asset Purchase Agreement between those parties -- the centerpiece of the transaction -- contains a provision that chooses New Jersey law to govern the contract. According to the Restatement, if we characterize the issue as purely contractual, and strictly apply the rules governing choice of law in contracts interpretation cases, the APA's choice of law provision would likely stand unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of §188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflicts of Law § 187(2).

The ordinary rule of successor liability is rooted in corporate law, and it states that a firm that buys assets from another firm does

not assume the liabilities of the seller merely by buying its assets. See, e.g., Luxliner P.L. Export Co. v. RDI/Luxliner, Inc., 13 F.3d 69 (3d Cir. 1993); Polius v. Clark Equip. Co., 802 F.2d 75 (3d Cir. 1986) (noting that the general rule of corporate successor liability was "designed for the corporate contractual world where it functions well"); 15 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 7122.  The problem of characterization lies in the mottled nature of the exceptions to the ordinary rule in successor liability law because they are not uniformly characterized as wholly based in tort, contract, or corporate law.  See, e.g., United States v. General Battery Corp., 423 F.3d 294, 301 (3d Cir. 2005) (noting that the choice of law framework governing successor liability remains "unsettled");  Savage Arms, Inc. v. Western Auto Supply Co., 18 P.3d 49, 53 (Alaska 2001) (analyzing other states' approaches to successor liability law and concluding that successor cases dealing with products liability are appropriately charaterized as torts questions); Ruiz, 89 F.3d at 326 (noting that many courts have "struggled to decide whether [successor liability] is part of corporate law or tort law"); Webb v.Rodgers Mach. Mfg. Co., 750-F.2d 368, 374 (5th Cir. 1985); In re Asbestos Litigation (Bell), 517 A.2 d 697, 699 (Del. Super. 1986) (holding that contract/corporate law applied to successor liability case based on legal effect of contract between corporations).

While the basic tenet of successor liability law is based in corporate law, the exceptions span a loose substantive continuum from contract to corporate to tort law.  There are four traditional exceptions, all founded in corporate and contract law.  See Ruiz, 89 F.3d at 326.  The first exception covers situations where the buyer either expressly or implicitly agrees to assume some or all of the seller's liabilities.  It is usually straightforward in application. Because this exception is based on interpreting the terms of the parties' agreement, it is characterized most strictly as contract law. See, e.g., T.H.S. Northstar Associates v. W.R. Grace & Co.-Conn., 840 F. Supp. 676, 677-78 (D. Minn. 1993) (indicating that the Court would enforce the contractual choice of law clause under an "express assumption of liability" theory of successor liability). The second exception applies where a transaction is entered into

fraudulently in order to evade liability.[2]  The third and fourth exceptions, *de facto* merger and mere continuation, are generally treated identically, see, e.g., Luxliner, 13 F.3d at 73 (stating that "[m]uch the same evidence is relevant to each determination," and listing the same factors as necessary to determine "whether either of these exceptions applies"), as both arise where there is continuity of identity between the buyer and seller,  see Ruiz, 89 F.3d at 325 ("In effect, the de facto merger and continuation exceptions are identical; each exception depends upon an identity of ownership between the seller and purchaser").  "Mere continuation" analysis focuses on whether the new corporation is merely a restructured form of the old, while *de facto* merger analysis inquires whether a transaction -- though structured as an asset purchase -- factually amounts to a consolidation or merger.

Additionally, many states have adopted rules expanding successor liability in products liability cases.  See Dawejko v. Jorgensen Steel Co., 434 A.2d 106,111 (Pa. Super. 1981); Ramirez v. Amsted Industries, Inc., 431 A.2d 811, 824-825 (N.J. 1981); see also Ray v. Alad Corp., 560 P.2d 3 (Cal. 1977) (departing, for the first time, from traditional corporate law grounding of successor liability).  Under the so-called "product line" theory, the successor corporation remains strictly liable in tort for the defective products of its predecessor.  We need not, and do not here, characterize the substantive law of the product line exception, but merely note the confusing effect of introducing an explicitly tort-based exception to a traditionally corporate- and contract-based doctrine.  Thus, at one extreme lies the explicit and implicit assumption of liability exception, interpreted solely based on contract.  At the other lies the product line exception, which is generally analyzed using torts choice of law principles.  The *de facto* merger/continuation exception to successor liability rests somewhere in the middle.

---

[2]  Some states recognize transfer for inadequate consideration as an additional exception, see, e.g., Lopata v. Bemis Co., Inc., 383 F. Supp. 342 (E.D. Pa. 1974); however, this seems more properly viewed as a form of constructive fraud, see, e.g., Marie T. Reilly, Making Sense of Successor Liability, 31 Hofstra L. R. 745, 757 (2003).

The *de facto* merger exception is not strictly contractual because it is an equitable principle, ultimately designed to look beyond the contract. As an initial matter, the Restatement itself suggests that we consider whether the parties could have contracted about the subject matter at issue. A contractual choice of law provision applies, with certain limitations, to issues that the parties "could have resolved by an explicit provision" of the contract. Restatement (Second) of Conflicts of Law § 187 (1); see also Chestnut v. Pediatric Homecare of America, Inc., 420 Pa. Super. 598, 604 (1992) (applying Pennsylvania law to an issue according to Restatement (Second) of Conflicts of Law § 187(2)(b), while recognizing that parties did not have the power to contract as to the issue); Schifano v. Schifano, 471 A.2d 839, 843 n.5 (Pa. Super. Ct. 1984). A *de facto* merger inquiry investigates whether a transaction labeled "Asset Purchase Agreement" in fact constituted a merger -- a determination that does not arise purely from the agreement itself. Thus, SPI and Hull could not have controlled, through express contractual language, whether their agreement in fact constituted a merger. Though strict adherence solely to the Restatement might lead to a different result, under Pennsylvania's flexible combination of Restatement and interest-based analysis, the contractual choice of law provision should not apply to the issue. Cf. T.H.S. Northstar Associates, 840 F. Supp. at 678.

Our cases have acted upon this principle, although none has explicitly addressed it. See SmithKline Beecham Corp. v. Rohm & Haas Co., 89 F.3d 154, 162 (3d Cir. 1996) (using law chosen by contract to interpret contract terms, but engaging in Pennsylvania choice of law analysis to determine successor liability); Rego v. ARC Water Treatment Co., 181 F.3d 396, 401 (3d Cir. 1999) (observing that successor liability is "derived from equitable principles"). Other federal courts have explored the issue in more detail. See, e.g., Source One Enterprises. v. CDC Acquisition Corp., No. 02-4925, 2004 WL 1453529 at *1 (D. Minn. June 24, 2004) (indicating that contractual choice of law clause did not apply to successor liability); East Prairie R-2 School District v. U.S. Gypsum Co., 813 F. Supp. 1396 (E.D. Miss. 1993) (using the Restatement-based choice of law rules of Missouri to determine that, while contractual choice of law clause applied to contract terms, Mississippi law controlled successor liability issue).

14

In general, while it makes sense to allow the parties to a contract to control which law applies to their agreement, it does not follow that the contract provisions should control an inquiry that, by its nature, looks beyond the contract. In a strict Restatement analysis, we would be guided towards giving effect to the contractual choice of law by considerations such as protecting the parties' justified expectations and assuring certainty, predictability and uniformity of results. Restatement 2d of Conflicts of Laws § 6(2)(d) & (f). These factors, however, do not apply to the equitable application of successor liability. Here, there is no protection of justified expectations because SPI and Berg did not bargain with each other; Berg brought a third-party action.[3] Cf. International Paper Co. v. Midvale-Heppenstall Co., 1973 WL 15333 (Pa. Com. Pl.) (applying freely bargained-for contractual choice of law provision but failing to characterize individual issues as required by depecage). Even when we consider that SPI and Hull bargained over the provisions of the Asset Purchase Agreement, the fact remains that they bargained for New Jersey law to apply to interpretation of the provisions of the contract, not to their real-world effect. In short, the nature of an inquiry into the *de facto* merger exception to successor liability speaks against following the APA's choice of law provision. As we acknowledged in Polius, the court steps in "when the form of the transfer does not accurately portray substance." 802 F.2d at 78. Ultimately, in conducting choice of law analysis for this situation, we should look to the substance of the transaction, rather than to the form of the agreement; therefore, the APA's choice of law provision does not control.

C.

Yet, there is more than one contract to consider. The few courts applying choice of law analysis to this highly specific situation -- a third-party breach of contract suit based on successor liability -- have generated somewhat confusing opinions. This is

---

[3] In fact, as we determined in Berg Chilling Systems, Inc. v. SP Industries, SPI bargained with Hull to construct the Asset Purchase Agreement specifically to avoid liability to third parties such as Berg. 369 F.3d 745, 757-58 (3d Cir. 2004).

because there is no clear line of reasoning specifying *which* contract is the anchor point for a choice of law analysis.  Though we have already examined the APA, some courts ignore similar documents entirely.   Some courts use the breached contract as the exclusive basis for their analysis of which state's successor liability law to apply.  See, e.g., Johnson v. Ventra Group, Inc., 191 F.3d 732, 739-40 (6th Cir. 1999) (using employee's breached contract with former employer to supply proper state law to apply to potential liability of employer's "successor," primarily because employee bargained for choice of law clause).  Other courts avoid looking at any contracts.  See, e.g., Schwartz v. Pillsbury Inc., 969 F.2d 840, 845 (9th Cir. 1992) (applying California law, despite New York choice of law clause in breached franchise agreement, "because the issue does not involve the interpretation or enforcement of the franchise agreement;" and failing to mention corporate "successor" transaction altogether).

The overarching problem is that, however many transactions interlock to form a factual nucleus, there is no one contract to which all the involved entities are parties. That is assuredly true in this case, where, unpacking the contractual relations among the parties, there are somewhere between two and four relevant contracts.  The first relevant contract is the APA, which we have already discussed.  The second is the Modified Agreement, the contract that Berg sued Hull and SPI for breaching.  SPI did not even sign the Modified Agreement; it became effective one week before Hull and SPI finalized the sale of Hull's FDC Division.  The Modified Agreement, however, does not stand on its own.  It is a relatively short document, and it specifically refers back to the original Huadu Contract, giving each signatory to the Modified Agreement all the rights each held under the Huadu Contract.  As to Huadu and Berg, it is clear that all terms of the Huadu Contract that were not superceded by the Modified Agreement remained in full effect.  This is confirmed by the fact that Huadu and Berg adhered to the agreement by submitting to arbitration in Sweden, as provided by the Huadu Contract, for Berg's breach of the Modified Agreement.  Hull, however, had a previous legal relationship only with Berg, via the Purchase Agreement. Because Hull did not bargain for rights under the Huadu Contract, and was not a signatory to it, Hull remained liable only under the Modified Agreement.

In order to properly follow the flexible approach articulated in Griffith and since followed by this Court in Compagnie des Bauxites and its progeny, it makes sense to consider both the APA and the Modified Agreement (and, to the extent relevant, the Huadu Contract and Purchase Agreement) in conducting our choice of law analysis. Because it was impossible for any of these contracts to have made an effective choice of law on successor liability, we will look to the grouping of contacts with the various concerned jurisidictions. See Restatement 2d of Conflicts of Laws § 188; Compagnie des Bauxites, 880 F.2d at 689 (interpreting Griffith to mean that proper choice of law analysis involves "grouping of contacts with the various concerned jurisdictions and the interests and policies that may be validly asserted by each jurisdiction."). Relevant contacts in a contract case[4] include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, (e) the domicil, residence, nationality, place of incorporation and place of business of the parties. These contacts are to be evaluated according to their relative importance with respect to the particular issue." Compagnie des Bauxites, 880 F.2d at 689. Here, we will analyze only factors (c), (d), and (e), as the place of contracting and of negotiation are of minor importance to the issue.

The initial factor in our analysis is place of performance. Regarding the APA, the performance was the sale of Hull's FDC Division to SPI, making this factor essentially a combination of the location of the Division's assets and the places of business of the seller and buyer. The Modified Agreement envisioned essentially two places of performance: Pennsylvania, the situs of Hull's freeze dryer manufacturing facilities, and China, the location where the freeze dryers were erected and subjected to performance testing.

The second factor is the location of the subject matter of the contract. The subject matter of the APA is the assets, properties, rights, and businesses related to the conduct of the "Business,"

---

[4]Although Griffith was a tort action, its analysis has been regularly applied to contract actions. See, e.g., Compagnie de Bauxites, 880 F.2d at 689.

17

defined in the contract as: "manufacturing, remanufacturing, installing, servicing, marketing, selling, and distributing standard and customized vacuum drying, freeze drying, and vacuum shelf drying equipment and related products, equipment and systems for customers involved in the pharmaceutical, animal health, diagnostic, biotech and food industries." (A962). Many of these activities, conducted exclusively through Hull's FDC Division, don't have an easily identifiable "location." To the extent that Hull Corporation's FDC division - the subject matter of the Asset Purchase Agreement - has a "location," it is primarily in Pennsylvania: tangible purchased assets included equipment, inventory, and real estate located in Pennsylvania. The freeze dryers were the subject matter of the Modified Agreement. Manufactured by Hull in Pennsylvania under the original Purchase Agreement, by the time of the Modified Agreement the freeze dryers were already installed, albeit imperfectly, at Huadu's facilities in China. Berg had delivered the freeze dryers from Hull's Pennsylvania site to Huadu's site in China, where they remain, pursuant to the arbitration settlement between Berg and Huadu.

The third factor is the domicil, residence, nationality, place of incorporation and place of business of the parties. There are two sets of parties: Hull and SPI, parties to the APA; and Hull, Berg, and Huadu, parties to the Modified Agreement. Hull is incorporated in Pennsylvania. SPI is a Delaware corporation. While SPI's primary place of business is in New Jersey, it operated the freeze dryer business that it bought from Hull from the same premises in Pennsylvania that it leased from Hull Corporation. Berg is a Canadian Company whose legal address and place of business is in Ontario, Canada. Huadu is a Chinese company whose legal address and place of business is in Beijing, China.

We view the relevant contacts qualitatively and in their totality. See Cipolla, 439 Pa. 563. Although much of the relevant activity took place in China, the only company actually located there is Huadu, which is not a party to the present action. The next most relevant location is Pennsylvania: Hull's place of incorporation and the location of the site where the freeze dryers were manufactured. Accordingly, we will apply the successor liability law of the state of Pennsylvania.

18

### III.

Where one company sells or otherwise transfers all of its assets to another company, the latter is not normally liable for the debts and liabilities of the transferor. However, if circumstances indicate that there was a *de facto* consolidation or merger of the corporations or that the purchasing company was a "mere continuation" of the selling company, liability may attach. The *de facto* merger exception is similar to the continuation exception, save that the latter focuses on situations in which the purchaser is merely a restructured or reorganized form of the seller. Although the parties separate their analyses, we follow the trend of the courts here and treat the exceptions identically.

We now turn to the *de facto* merger analysis. In determining whether a transaction is a *de facto* merger or continuation, we look to the following factors:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.
> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.
> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
> (4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Philadelphia Electric Co. v. Hercules, Inc., 762 F.2d 303, 310 (3d Cir. 1985) (applying Pennsylvania law).

19

As noted earlier, the District Courts in this Circuit consider the second factor - continuity of ownership - to be critical to a successful successor liability claim under Pennsylvania law. See Forrest v. Beloit Corp., 278 F. Supp. 2d 471, 477 (E.D. Pa. 2003) (finding that *de facto* merger claim failed as a matter of law because there was no stock transfer between the so-called predecessor and successor corporations), rev'd on other grounds, 2005 WL 2245640 (3d Cir. Sept. 15, 2005); Glynwed, Inc. v. Plastimatic, Inc., 869 F. Supp. 265, 277 (D.N.J. 1994); Tracey v. Winchester Repeating Arms Co., 745 F. Supp. 1099, 1109-10 (E.D. Pa. 1990) (finding continuity of stock ownership to be the "essential element" to application of de facto merger exception). In fact, only one District Court applying Pennsylvania law has been willing to find liability despite a partial-cash sale. Fiber-Lite Corp. v. Molded Acoustical Products of Easton, Inc., 186 B.R. 603 (E.D. Pa. 1994), aff'd mem. 66 F.3d 610 (3d Cir. 1995). However, the most recent Pennsylvania court decision on the matter did not specifically adopt the Pennsylvania District Courts' formulation of stock ownership as the "essential element." Yet, it also did not take the opportunity to disagree with the District Courts, and lists "continuity of ownership" as the first factor in the four-factor test. Cont'l Ins. Co. v. Schneider, Inc., 810 A.2d 127, 134-36 (Pa. Super. Ct. 2002), aff'd, 873 A.2d 1286 (Pa. 2005). If we were to strictly apply the reasoning of the District Courts, this inquiry would be over, as there is no continuity of stock ownership between Hull and SPI . Given the Pennsylvania state courts' failure to specifically adopt such a bright-line standard, however, we will instead conduct a full analysis that emphasizes the ownership factor but does not rely on it alone.

First, we determine whether there was continuity of ownership between Hull and SPI. The objective of this requirement is usually to identify situations in which shareholders of a seller corporation unfairly attempt to impose their costs or misdeeds on third parties by retaining assets that have been artificially cleansed of liability. See General Battery, 423 F.3d at 306-07 (evaluating corporate successor liability under CERCLA); see also SmithKline Beecham, 89 F.3d at 164. Here, there was no continuity of stock ownership between Hull and SPI, as the APA fixed consideration at $6 million in cash. Berg II, at *4. Based on this key factor, we continue the remainder of the analysis with a

strong presumption against imposing successor liability.

Next, we investigate whether SPI "continued the enterprise of the seller corporation" Hull, an inquiry that depends on how we define the term "enterprise." There is ample evidence to support the conclusion that SPI, through its VirTis/Hull Company Division, continued the business operations of Hull's FDC Division. SPI purchased all of the FDC Division's equipment and inventory, assumed tenancy of the Division's manufacturing facilities (though eventually did not purchase the associated real estate), manufactured the same products, took over many contractual obligations, and used the same personnel, telephone number, and fax number. SPI also renamed its VirTis Division "Hull Company" specifically to take advantage of the Hull name's acceptance in the community, and purchased the Hull logo for the same purpose. On the corporate level, however, there is no indication that SPI continued Hull's enterprise; indeed, until recently, Hull was extant and master of its own corporate destiny. There was no continuity of corporate management: no member of Hull's Board of Directors held a position on SPI's Board of Directors. Although Hull's Chairman, Lewis Hull, became "Chairman of the Hull Company Division," the title was solely honorary and he had no capacity to bind SPI or its Hull Company Division. John Hull, a corporate officer at Hull Corporation, became a temporary consultant to the Hull Company Division, also with no authority to bind either SPI or the Hull Company Division. Thus, while it is clear that two divisions combined operations as a result of the APA, there is no support for the proposition that SPI continued Hull's corporate enterprise.

Third, we look to whether the seller corporation ceases operation and liquidates. The *de facto* merger doctrine recognizes that an essential characteristic of a merger is that one corporation survives while the other ceases to exist. See General Battery, 423 F.3d at 308 (citing Knapp v. N. Am .Rockwell Corp., 506 F.2d 361, 367 (3d Cir. 1974) (applying Pennsylvania law)). Here, the FDC Division of Hull Corporation ceased its freeze drying operations and agreed not to compete with SPI's Hull Company Division. Yet, Hull continued to exist as a corporate entity, and continued to operate its other divisions, for years after the APA closed. Berg II, at *4. Thus, this factor does not support a *de facto*

21

merger.

Finally, we determine whether the seller corporation has assumed the obligations ordinarily necessary for uninterrupted continuation of normal business operations. Here, the APA unambiguously provided that SPI acquire all accounts receivable and all contracts relating to the operation of the FDC Division of Hull. It is equally unambiguous that SPI did not assume any of Hull's obligations relating to any other division: the APA itself defined the subject matter of the contract as only the FDC Division, and specifically excluded all other corporate assets and liabilities. Moreover, the APA provided that SPI assume only limited liabilities from Hull; for example, SPI did not assume Hull's pre-closing contractual liabilities to third parties. Berg Chilling, 369 F.3d at 758.

In sum, the APA resulted in a combination of like corporate *divisions*, but not of corporate *entities*. Thus, the *de facto* merger exception to the rule of successor non-liability will not render SPI liable for Hull's breach of the Modified Agreement.

IV.

This court found that the APA operated to exculpate SPI from any liability arising from Hull's work, or from its own attempts to cure defects in Hull's work, on the freeze dryers for the Huadu Contract. Berg Chilling, 369 F.3d at 745. Berg now presents the same arguments it put forward to the District Court in Berg II; namely, that the so-called "exculpatory" clause in Section 7.8 is void as against public policy. Applying New Jersey law, per Section 10.6 of the APA, the District Court held that public policy did not void the clause. For the following reasons, we agree.

Berg first argues that two sections of the New Jersey Code act to void Section 7.8. The first section invalidates any agreement "purporting to indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee....." N.J. Stat. Ann. § 2A:40A-1 (2005). The second voids any agreement indemnifying an architect, engineer, or surveyor for "damages, claims, losses, or expenses" caused

22

either by preparing reports or specifications; or by giving or failing to give instructions.  N.J. Stat. Ann. § 2A:40A-2 (2005) (emphasis added).

Neither statute is applicable to the clause at issue in Section 7.8.  First, the clause does not fall under the purview of Section 2A:40A-1 because it does not relate to negligence.  By its plain language, Section 2A:40A-1 is limited to prohibit clauses through which a party seeks to be indemnified for damages resulting from "sole negligence."  Further, while Berg seeks to recover damages related to the breached contract with Huadu,[5] Section 2A:40A-1 only applies to traditional negligence recovery; that is, "damages arising out of bodily injury to persons or damage to property." Moreover, the clause at issue does not absolve SPI of responsibility for its own negligence; rather, it is a disclaimer of liability to third parties for faulty products shipped by Hull prior to the date SPI took over the business.  The term, therefore, only assures that SPI will not be liable to third parties based on Hull's actions. Therefore, because the clause does not relate to SPI's negligence -- much less to its sole negligence -- and because both statutes are limited to actions in tort, neither New Jersey statute voids Section 7.8.

Second, both statutes were intended to apply to construction contracts.  Berg II, at *3.  Legislative history confirms the District Court's interpretation by introducing both statutes as "amend[ing] a recently-enacted law, P.L.1981, c. 317, which prohibits hold harmless clauses in *construction contracts* which indemnify the promisee for any damages regardless of the extent of his negligence." Assembly, No. 590-L.1983, c.107 (emphasis added); accord Ryan v. Biederman Indust. 223 N.J. Super. 492, 500; 538 A.2d 1324, 1329 (1988) (indicating that stated purpose of the amendment was "to clarify the purpose behind the original enactment.").  We find unconvincing Berg's argument that New Jersey courts would find the Huadu freeze dryers to be within the

---

[5] Berg  notes in its brief that it did assert tort claims for contribution and common law indemnification against SPI. However, neither of these claims relate to the clause in Section 7.8, nor do they relate to negligence.

scope of "appliances or appurtenances" in Section 2A:40A-1. Berg assumes that the New Jersey courts would term the freeze dryers appliances or appurtenances based on a Georgia District Court decision interpreting a similar statute. <u>See Federal Paper Bd. Co., Inc. v. Harbert-Yeargin, Inc.</u>, 53 F. Supp. 2d 1361 (N.D. Ga. 1999) (finding paper mills to be "appliances or appurtenances" under similar Georgia statute). This is unlikely, as the Georgia District Court specifically noted the "expansive" way that Georgia state courts interpreted the statute to include leases and maintenance agreements, a view that the New Jersey state courts do not demonstrably share. <u>Id</u>.

Berg additionally claims that Section 7.8 violates New Jersey public policy because it violates common law dictating that "professionals" be held to the standards of their profession. <u>See, e.g., Erlich v. First National</u>, 505 A.2d 220 (N.J. Super. Ct. Law Div. 1984). This argument is unpersuasive. The New Jersey common law is based on the principle that "courts will not enforce an exculpatory clause if the party benefiting from exculpation is subject to a positive duty imposed by law or is imbued with a public trust, or if exoneration of the party would adversely affect the public interest." <u>Erlich</u>, 208 A.3d at 232. Thus, as part of New Jersey's basic doctrine disallowing liability limitation in areas of the public interest, exculpation clauses are disfavored in contracts for professional services in order to protect the individual relying on the professional's expertise**.** <u>See Lucier v. Williams</u>, 366 N.J. Super 485, 496 (2004) (determining that exculpation clause in contract for home inspection was invalid as violating public policy). This doctrine is not applicable in a situation in which two sophisticated corporations deliberately rely on one another's expertise, yet are able to allocate liability through contract. Further, Section 7.8 is not voided by the common law because it does not absolve SPI of liability for its *own* actions; it merely indicates that SPI does not assume any of *Hull's* liability to third parties. Berg is seeking to characterize the disputed clause in Section 7.8 as "exculpatory," yet it is not, because it does not relate to SPI's own negligence. <u>See Valhal Corp. v. Sullivan Assoc., Inc.</u>, 44 F.3d 195 (3d Cir. 1995) (defining "exculpatory" as absolving a party from his own negligence). Thus, because the public trust is not at issue, and because the Section 7.8 does not seek to exonerate SPI for its own actions, the common law does not apply.

24

## V.

Finally, Berg argues that because SPI did not specifically appeal the District Court's original order finding that Berg had a right to contribution from SPI, the District Court erred by vacating that order on remand. However, that order was predicated on the finding that "Berg, SPI, and Hull Corporation were equally at fault" in breaching the Huadu Contract. <u>Berg I</u>, at *11. As the District Court explained, contribution is "an attempt by equity to distribute equally among those who have a common obligation, the burden of performing that obligation." <u>Id</u>. at *11 n.15 (citation omitted). Thus, Berg can no longer assert a right to contribution because this Court reversed that order and determined that SPI was not at fault. <u>See</u> <u>Berg Chilling</u>, 369 F.3d at 745. SPI, therefore, cannot be liable to Berg for contribution.

## VI.

We recognize that this judgment places Berg in an untenable situation. Based on the last several years of litigation, it appears that Hull Corporation bears the greatest responsiblity for breaching the Modified Agreement; but Hull is now out of business and lacks assets. For these reasons, we affirm.

AMBRO, <u>Circuit Judge</u>, Dissenting

Although the majority ably argues for the application of Pennsylvania law to preclude Berg's successor liability claim, I respectfully dissent because (1) I am not convinced that Pennsylvania law should apply to this dispute and, (2) even if it does, I do not believe that Pennsylvania law precludes a finding of successor liability.

There is no question that, for contractual matters arising under the Asset Purchase Agreement ("APA") between SPI and Hull, New Jersey law would apply pursuant to the agreement's explicit choice of law. In this case, of course, we are not faced with a dispute between the parties to the APA, but rather with a third-party successor liability claim. Notwithstanding this

25

distinction, I am of the view that the successor liability claim involved here relates to the "interpretation, construction, [and] effect" of the asset purchase transaction, and is, therefore, within the scope of the broad choice of law provision contained in the APA. I am thus unpersuaded that, as the majority states, "SPI and Hull . . . bargained for New Jersey law to apply to interpretation of the provisions of the contract, not to their real-world effect."

To the contrary, in deciding whether the APA accomplished a de facto merger of SPI and Hull, the "effect[s]" of the APA fall squarely within SPI's choice of New Jersey law. Since we have already held that Berg, a non-party to the APA, is nonetheless bound by the APA's exculpatory provisions, see Berg Chilling Systems, Inc. v. Hull Corp., 369 F.3d 745, 757-58 (3d Cir. 2004), I find it incongruous for SPI to argue on this appeal, and for the majority to agree, that Berg's successor liability claim against SPI for Hull's obligations is not "contractual" because Berg was not a party to the APA and therefore the choice of law provision is irrelevant. In sum, because SPI agreed in the APA to apply New Jersey law to all effects of the asset purchase transaction, and Berg's successor liability claim clearly implicates the effects of the APA, I would hold that SPI is bound by the choice of law it made, especially since it has already benefitted from that choice in successfully using the APA's exculpatory provision as a shield against direct liability to Berg.

Applying the choice of law clause as written, this dispute should be governed by New Jersey law[6] — which, as the majority correctly notes, would almost certainly result in a victory for Berg.

_____

[6] Pennsylvania law states that "[c]hoice of law provisions in contracts will generally be given effect," Smith v. Commonwealth Nat'l Bank, 557 A.2d 775, 777 (Pa. Super. Ct. 1989), and "Pennsylvania courts will only ignore a contractual choice of law provision if that provision conflicts with strong public policy interests," Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 56 (3d Cir. 1994).

Not only does New Jersey's successor liability standard place great importance on the parties' intent and deemphasize continuity of ownership, see, e.g., Woodrick v. Jack J. Burke Real Estate, 703 A.2d 306, 313 (N.J. App. Div. 1997), but it provides that the mere fact a purchaser acquires a division of another company, and the seller maintains its operations in other respects, does not defeat a finding of successor liability with respect to the acquired division. See, e.g., Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F. Supp. 2d 324, 337 (D.N.J. 2002). This answers the majority's reliance on the fact that "the APA resulted in a combination of like corporate divisions, but not of corporate entities" as support for its conclusion that the de facto merger doctrine is inapplicable.

Even assuming, however, that the majority is correct and Pennsylvania law applies, I am unconvinced that Pennsylvania would not find successor liability in this case. Contrary to the majority's interpretation, the case upon which it principally relies as evidence of Pennsylvania law, Continental Insurance Co. v. Schnedier, Inc., 810 A.2d 127 (Pa. Super. Ct. 2002), does not "emphasize[]" the continuity of ownership factor nor does it stand for the proposition that the absence of such continuity yields a "strong presumption against imposing successor liability." Rather, Continental Insurance states:

> [W]hen determining if a de facto merger has occurred, courts generally consider four factors: (1) continuity of ownership; (2) cessation of the ordinary business by, and dissolution of, the predecessor as soon as practicable; (3) assumption by the successor of liabilities ordinarily necessary for uninterrupted continuation of the business; and (4) continuity of the management, personnel, physical location, and the general business operation. Although

27

> each of these factors is considered, all
> need not exist before a de facto merger
> will be deemed to have occurred.

Id. at 135 (internal citations omitted; emphasis added).

As the majority states, there is "ample evidence" that SPI sought to, and did, continue the business operations of Hull's FDC Division. SPI used the same facilities, equipment, personnel, logo, and telephone and fax numbers as Hull's FDC Division. SPI continued to manufacture the same products as Hull and maintained Hull's contractual obligations. SPI retained Hull's Chairman, Lewis Hull, and held him out in its promotional materials as "Chairman" of the new Hull Division, and retained Hull's Executive Vice President, Bernard Kashmer, for two years as Executive Vice President of the Hull Division. Hull ceased doing the type of business its FDC Division had been doing and agreed not to compete with SPI. SPI's President and CEO, John Partridge, testified that he was interested in Hull's FDC Division as an ongoing business, intended to operate it as an ongoing business, and wanted to "continue to use the name of Hull because of its acceptance in the marketplace." SPI represented in its promotional materials that its Hull Division was founded in 1952 and was approaching its 50th anniversary, and Partridge testified that SPI "was saying by way of this [that it was] counting all the years that the Hull Corporation had been in existence," and was "tak[ing] it back to when that company was founded and tak[ing] credit for that length of service." When asked if he was taking credit for Hull's 50 years of business "because you were really continuing what had been the FDC freeze-drying business," Partridge replied, "Yes." Perhaps most tellingly, SPI and Hull represented to their customers and employees that the transaction was a merger; indeed, Hull informed Berg before the APA was concluded that Hull's responsibilities under the agreement with Berg would "of course be assumed by the successor," and Lewis Hull referred to the transaction in a Hull newsletter after the APA was concluded as a "textbook strategic merger."

28

Based on this evidence, I am unpersuaded that Pennsylvania law would not find successor liability in this case. Continental Insurance, which the majority describes as "the most recent Pennsylvania court decision on the matter," does not privilege the continuity of ownership factor above all others; rather, in keeping with the modern view of successor liability, it counts continuity of ownership as one of several factors to consider, and notes that all factors need not exist. Here, there can be little question that SPI's continuation of Hull's business satisfies the third and fourth factors listed in Continental Insurance: SPI sought to, and did, continue Hull's business, and in doing so assumed the necessary contractual liabilities and retained key management, personnel, facilities, trademarks, telephone numbers, etc. As for the second factor, Hull immediately ceased the business of its FDC Division — the only Hull property that has anything to do with this appeal — upon conclusion of the APA and agreed not to resume such business, and the FDC Division was dissolved. Although Hull continued to operate unrelated divisions for a short time after it sold its FDC Division to SPI, Hull, too, eventually ceased to exist. Indeed, the only factor that clearly does not weigh in favor of a finding of successor liability here is the continuity of ownership. Contrary to the majority, I would find that these circumstances should result in a finding of successor liability under Pennsylvania law.

At base, I am troubled by the consequences of concluding that successor liability does not exist in this case. SPI purchased an entire division of Hull and operated that division as an ongoing business, holding the division out to the world as a continuation of Hull, and presumably reaping substantial rewards by doing so. That division was almost entirely responsible for serious deficiencies in freeze dryers sold to Berg, but SPI disclaimed any resulting liabilities in an asset purchase agreement that was negotiated without Berg's participation, all while Berg was being assured by Hull that "of course" SPI would assume full liability. Shortly after the sale of Hull's FDC Division to SPI, Hull went out of business. The result, therefore, is that SPI gets the benefit of the continuation of Hull's business without any attendant liabilities,

Hull effectively avoids liability by selling off its assets, and, because of our holding today, Berg is left to bear all the liabilities for a problem it did not create. As my majority colleagues note, this "places Berg in an untenable situation." As I do not perceive a compelling reason why we must do so, I respectfully dissent.